2006 VT 78

# Lisa Miller-Jenkins v. Janet Miller-Jenkins

[912 A.2d 951]

Nos. 04-443 & 05-030

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 4, 2006

Motion for Reargument Denied November 9, 2006

444

*Judy G. Barone* of *Readnour & Barone*, Rutland, and *Mathew D. Staver* and *Rena M. Lindevaldsen*, Liberty Counsel, Longwood, Florida, for Plaintiff-Appellant.

*Theodore A. Parisi, Jr.* of *Law Offices of Theodore A. Parisi, Jr., P.C.*, Castleton, and *Mary L. Bonauto, Jennifer L. Levi* and *Karen L. Loewy*, Gay & Lesbian Advocates & Defenders, Boston, Massachusetts, for Defendant-Appellee.

*Eileen M. Blackwood* of *Blackwood & Danon, P.C.*, Burlington, for Amicus Curiae Vermont Psychiatric Association, Vermont Chapter of the National Association of Social Workers, Lynn Bond, Ph.D., David Chambers, J.D., Esther Rothblum, Ph.D., and Jacqueline S. Weinstock, Ph.D.

¶ 1. **Dooley, J.** Lisa Miller-Jenkins appeals a family court decision finding her ex-partner, Janet Miller-Jenkins, to be a parent of their three-year-old child conceived via artificial insemination. On appeal, Lisa[1] contests three family court decisions. First, she appeals the

---

[1] For clarity, we will refer to the parties by their first names.

decision by the Vermont family court that found both her and Janet to be legal parents of their child [hereinafter IMJ], and awarded Lisa temporary legal and physical rights and responsibilities of the child and Janet temporary parent-child contact. Second, Lisa appeals the family court's refusal to give full faith and credit to a Virginia court order, issued after the Vermont court's temporary custody and visitation order, that was contrary to the Vermont decree and that precluded Janet's visitation rights. Finally, Lisa appeals an order of contempt issued by the family court based on her failure to abide by the temporary visitation order.

¶ 2. We granted interlocutory appeal to address the validity of these orders. We conclude the civil union between Lisa and Janet was valid and the family court had jurisdiction to dissolve the union. Further, we decide that the family court had exclusive jurisdiction to issue the temporary custody and visitation order under both the Uniform Child Custody Jurisdiction Act (UCCJA), 15 V.S.A. §§ 1031-1051, and the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A (2000). We affirm the family court's determination that Janet is a parent of IMJ, the resulting visitation order, and the order of contempt issued against Lisa for her failure to abide by the visitation order.

¶ 3. Lisa and Janet lived together in Virginia for several years in the late 1990's. In December 2000, the parties traveled to Vermont and entered into a civil union. In 2001, while Lisa and Janet were still a couple, Lisa began to receive artificial insemination from sperm provided by an anonymous donor. Janet participated in the decision that Lisa become impregnated and helped select the anonymous donor. In April 2002, Lisa gave birth to IMJ, with Janet present in the delivery room. Lisa, Janet, and IMJ lived in Virginia until IMJ was approximately four months old and then moved together to Vermont around August of 2002. The parties lived together with IMJ in Vermont until the fall of 2003, when they decided to separate. After the separation, in September 2003, Lisa moved to Virginia with IMJ.

¶ 4. On November 24, 2003, Lisa filed a petition to dissolve the civil union in the Vermont family court in Rutland. In her complaint, Lisa listed IMJ as the "biological or adoptive child[] of the civil union." Lisa requested that the court award her custodial rights and award Janet parent-child contact. The family court issued a temporary order on parental rights and responsibilities on June 17, 2004. This order awarded Lisa temporary legal and physical responsibility for

IMJ, and awarded Janet parent-child contact for two weekends in June, one weekend in July, and the third full week of each month, beginning in August 2004. The family court also ordered Lisa to permit Janet to have telephone contact with IMJ once daily.

¶ 5. Although Lisa permitted the first court ordered parent-child-contact weekend, she did not allow Janet to have parent-child contact after that date, nor did she allow Janet to have telephone contact with IMJ, as the family court had ordered. In fact, Lisa has not allowed Janet to have any contact with IMJ other than during that first weekend. Meanwhile, on July 1, 2004, after the Vermont court had already filed its temporary custody and visitation order and parentage decision, Lisa filed a petition in the Frederick County Virginia Circuit Court and asked that court to establish IMJ's parentage.

¶ 6. In response, on July 19, 2004, the Vermont court reaffirmed its "jurisdiction over this case including all parent-child contact issues," stated that it would not "defer to a different State that would preclude the parties from a remedy," and made clear that the temporary order for parent-child contact was to be followed. It added that "[f]ailure of the custodial parent to allow contact will result in an immediate hearing on the need to change custody."

¶ 7. Although the Vermont and Virginia courts consulted by telephone, an interstate parental-rights contest ensued. On September 2, 2004, the Vermont court found Lisa in contempt for willful refusal to comply with the temporary visitation order. On September 9, the Virginia court held it had jurisdiction to determine the parentage and parental rights of IMJ and that any claims of Janet to parental status were "based on rights under Vermont's civil union laws that are null and void under Va. Code § 20-45.3." On October 15, the Virginia court followed with a parentage order finding Lisa to be the "sole biological and natural parent" of IMJ and holding that Janet has no "claims of parentage or visitation rights over" IMJ. That order is on appeal to the Virginia Court of Appeals.

¶ 8. On November 17, 2004, the Vermont court found that both Lisa and Janet had parental interests in IMJ and set the case for a final hearing on parental rights, property, and child support. Thereafter, on December 21, 2004, the Vermont court issued a ruling refusing to give full faith and credit to the Virginia parentage decision. Lisa appealed both of these decisions, as well as the decision finding her in contempt.

## I. Interstate Jurisdiction and Full Faith and Credit

¶ 9. This case is, at base, an interstate jurisdictional dispute over visitation with a child. Lisa argues here that the Vermont family court should have given full faith and credit to the Virginia court's custody and parentage decision, which determined Janet had no parentage or visitation rights with respect to IMJ. The family court rejected this argument because it concluded the Virginia decision did not comport with the PKPA, "which was designed for the very purpose of eliminating jurisdictional battles between states with conflicting jurisdictional provisions in child custody disputes." The Vermont court determined it had exercised jurisdiction consistent with the requirements of the PKPA and had continuing jurisdiction at the time Lisa's action was filed in Virginia. Therefore, it further concluded the Virginia court was prohibited from exercising jurisdiction by the PKPA, § 1738A(g), and the Vermont court had no obligation to give full faith and credit to the conflicting Virginia decision.

¶ 10. In analyzing Lisa's arguments, we note that she does not contest that if she and Janet were a validly married heterosexual couple, the family court's PKPA analysis would be correct. Because of her tacit acceptance of the family court's analysis with regard to jurisdiction under the PKPA, we provide only a summary description of why we believe that the family court was correct.

¶ 11. The purpose of the PKPA is to determine when one state must give full faith and credit to a child custody determination of another state, such that the new state cannot thereafter act inconsistently with the original custody determination. *Thompson v. Thompson*, 484 U.S. 174, 181 (1988). The PKPA follows on, and includes many of the provisions of, the Uniform Child Custody Jurisdiction Act (UCCJA), adopted in Vermont as 15 V.S.A. §§ 1031-1051. These acts were adopted to respond to "a growing public concern over the fact that thousands of children are shifted from state to state and from one family to another every year while their parents or other persons battle over their custody in the courts of several states." National Conference of Commissioners on Uniform State Laws, Uniform Child Custody Jurisdiction Act, Prefatory Note (1968). The PKPA embodies preferences "to leave jurisdiction in the state which rendered the original decree[,] . . . to promote the best interests of the child[,] . . . [and to] discourage[] interstate abduction and other unilateral removals of children for the purpose of obtaining

a favorable custody decree." *Michalik v. Michalik,* 494 N.W.2d 391, 398 (Wis. 1993).

¶ 12. The PKPA applies equally to a visitation determination, requiring states to enforce "any custody determination or visitation determination made consistently with the provisions of this section by a court of another State." 28 U.S.C. § 1738A(a). Because the first custody and visitation determination with respect to IMJ was made by the Vermont court, we must first examine whether that court exercised jurisdiction "consistently with the provisions of" the PKPA. *Id.* If it did, and if it continued to have jurisdiction when Lisa filed her proceeding in the Virginia court, the Virginia court was without jurisdiction to modify the Vermont order. *Id.* § 1738A(g), (h).

■ ¶ 13. In order for a Vermont court to exercise jurisdiction consistent with the PKPA, it must have jurisdiction under Vermont law, *id.* § 1738A(c)(1), and meet one of four conditions, *id.* § 1738A(c)(2)(A)-(D). In this case, it met the condition in subsection (A)(c)(2)(A)(ii) that Vermont "had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State." *Id.* § 1738A(c)(2)(A)(ii). For purposes of this provision, "home State" is defined to mean "the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months." *Id.* § 1738A(b)(4). Because Vermont had been IMJ's home state within six months before Lisa filed her dissolution petition in November 2003, Lisa had removed IMJ from Vermont, and Janet lived in Vermont on the date the dissolution proceeding was commenced, the requirements of subsection (A)(ii) were met. See *Matthews v. Riley,* 162 Vt. 401, 406, 649 A.2d 231, 236 (1994).

■ ¶ 14. The PKPA also requires that the court have jurisdiction under Vermont law. Whether local jurisdiction is present is determined by the UCCJA. 15 V.S.A. § 1032(a); *Matthews,* 162 Vt. at 406, 649 A.2d at 235. For the exact reason that the Vermont proceeding met the PKPA condition discussed above, *supra,* ¶ 13, it met the identically-worded provision of the UCCJA. Compare 15 V.S.A. § 1032(a)(1)(B) with 28 U.S.C. § 1738A(c)(2)(A)(ii). Thus, the family court had jurisdiction under Vermont law as required by 28 U.S.C. § 1738A(c)(1).

■ ¶ 15. Because the Vermont dissolution proceeding was still pending in July 2004, when Lisa filed her action in the Virginia court, and the Vermont proceeding was consistent with the PKPA, the Virginia court lacked jurisdiction pursuant to § 1738A(g) of the PKPA. That section specified that the court could not exercise jurisdiction over a proceeding to determine the custody of, or visitation with, IMJ while the Vermont proceeding was pending. The Virginia court violated this section by exercising jurisdiction over the case filed by Lisa.

■ ¶ 16. Because the Vermont court had issued a temporary custody and visitation order, the Virginia court was also governed by § 1738A(h) of the PKPA. That section prohibited the Virginia court from modifying the Vermont court's order unless the Vermont court "no longer [had] jurisdiction to modify such determination" or had "declined to exercise jurisdiction to modify such determination." Since the Vermont court continued to exercise jurisdiction over the Vermont proceeding, the Virginia court could have modified the order only if the Vermont court had lost its initial jurisdiction. Under the PKPA, a court that had initial jurisdiction to issue a custody or visitation order continues to have jurisdiction as long as it continues to have jurisdiction under state law and one of the contestants remains a resident of the state. *Id.* § 1738A(d); *Matthews*, 162 Vt. at 407, 649 A.2d at 236. The latter requirement is met because Janet continues to reside in Vermont.

■ ¶ 17. Again, the former requirement of continuing jurisdiction is met if it is authorized by the UCCJA. See *Matthews*, 162 Vt. at 407, 649 A.2d at 236-37. At the time the Virginia court acted, the Vermont court had jurisdiction to modify its own visitation order if:

> (2) it is in the best interest of the child that a court of this state assume jurisdiction because:
>
> (A) the child and his parents, or the child and at least one contestant, have a significant connection with this state; and
>
> (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

15 V.S.A. § 1032(a)(2). These provisions were met because IMJ had recently resided in Vermont and the evidence of IMJ's relationship

with Janet was present in Vermont. *Matthews*, 162 Vt. at 412, 649 A.2d at 239.

■ ¶ 18. The Vermont court had continuing jurisdiction over the matter of Janet's visitation with IMJ. Therefore, the Virginia order extinguishing Janet's visitation right was issued in violation of § 1738A(h) of the PKPA. The Vermont court was not required to give full faith and credit to the Virginia order issued in violation of the PKPA. *Matthews*, 162 Vt. at 412-13, 649 A.2d at 240.

¶ 19. Lisa makes three arguments against applying this analysis in this case. First, she argues that the Virginia proceeding is a parentage action, and the PKPA does not apply to parentage actions. Even if we were to accept this argument, we do not understand how it would determine the question before us — that is, whether the Vermont court must give full faith and credit to the Virginia parentage decision. Apparently, Lisa's logic is as follows: Although the Vermont court determined that Janet *is* a parent of IMJ, the Virginia court could and did determine that Janet *is not* a parent of IMJ; the Vermont court must now accept the Virginia determination and strike any visitation order based upon the Vermont parentage determination. Whether Virginia must enforce the Vermont visitation order is not directly involved in this appeal, but that is an entirely different question from whether full faith and credit requires the Vermont court to strike its own visitation order because the Virginia court refuses to recognize its validity based entirely on Virginia law. In *Medveskas v. Karparis*, 161 Vt. 387, 395, 640 A.2d 543, 546-47 (1994), we held that we would not extend full faith and credit to another state's custody determination if that state's court refused to extend full faith and credit to an earlier Vermont custody order. We will not give "greater faith and credit to the judgments of the courts of other states" than we give to our own courts' judgments. *Id.* at 394, 640 A.2d at 546 (quotations omitted). The same reasoning applies here.

¶ 20. Lisa is making the curious argument that if the PKPA does not apply to this dispute, Vermont will be required to give full faith and credit to the Virginia parentage decision and custody and visitation order. Our cases have routinely stated exactly the opposite position — that is, in the absence of a requirement imposed by the PKPA, Vermont courts will not extend full faith and credit to another state's custody and visitation order. See *Rocissono v. Spykes*, 170 Vt. 309, 316, 749 A.2d 592, 597 (2000) (Arizona's assertion of jurisdiction over custody dispute was inconsistent with the PKPA "and thus not

entitled to full faith and credit"); *Columb v. Columb*, 161 Vt. 103, 107, 633 A.2d 689, 691 (1993) (custody order that does not meet PKPA requirements "is not entitled to full faith and credit in other states").

■ ¶ 21. In any event, we reject the argument that the PKPA is inapplicable. The PKPA applies to custody or visitation determinations. 28 U.S.C. § 1738A(a). It defines a "custody determination" as "a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." *Id.* § 1738A(b)(3). It defines a visitation determination in nearly identical terms. *Id.* § 1738A(b)(9). Lisa's dissolution petition to the Rutland Family Court sought a custody determination, and the court's temporary order included a temporary determination of both custody and visitation. Lisa's parentage petition in the Virginia court sought a determination that Janet had no parental rights, and the Virginia court issued a temporary order requiring Janet's visitation to be supervised and then a permanent order that Janet had no right to visit IMJ. Plainly, the Virginia court decisions included visitation determinations as the term is defined in the PKPA. Just as plainly, the PKPA applied to those decisions.

¶ 22. Lisa's argument, then, is that a custody or visitation determination arising out of one kind of proceeding is covered by the PKPA, and a custody or visitation determination arising out of another is not. All of the decisions interpreting the PKPA in private family disputes conclude that the PKPA draws no such distinction. *Martinez v. Reed*, 623 F. Supp. 1050, 1055 (E.D. La. 1985) (PKPA applies to guardianship decision); *Guernsey v. Guernsey*, 794 So. 2d 1108, 1110 (Ala. Civ. App. 1998) (parentage); *Ray v. Ray*, 494 So. 2d 634, 637 (Ala. Civ. App. 1986) (guardianship); *In re Pima County Juvenile Action No. J-78632*, 711 P.2d 1200, 1206 (Ariz. Ct. App. 1985) (dependency proceeding initiated by grandfather), *rev'd on other grounds*, 712 P.2d 431, 435 (Ariz. 1986); *In re B.B.R.*, 566 A.2d 1032, 1040 n.24 (D.C. 1989) (habeas corpus); *E.E.B. v. D.A.*, 446 A.2d 871, 876 (N.J. 1982) (habeas corpus); *In re Bean*, 511 S.E.2d 683, 686 (N.C. Ct. App. 1999) (termination of parental rights). In fact, this Court recently held that the PKPA applied to a guardianship proceeding from another state. *Jackson v. Hendricks*, 2005 VT 113, ¶ 9 n.1, 179 Vt. 549, 893 A.2d 292 (mem.). The one case on which Lisa relies found that the PKPA did not apply to a parentage proceeding precisely because no party asked for a custody or visitation order and the court did not address custody or visitation. *Sheila L. v. Ronald*

*P.M.*, 465 S.E.2d 210, 221 (W. Va. 1995). Such a situation is inapposite to the circumstances in this case.

¶ 23. We recognize that some courts have held the PKPA does not apply to neglect and dependency proceedings where the state is intervening to protect the child, see *In re A.L.H.*, 160 Vt. 410, 413 n.2, 630 A.2d 1288, 1290 n.2 (1993) (citing cases), and Lisa has referenced these cases. These cases rely on three rationales: (1) the UCCJA explicitly applies to "neglect and dependency proceedings," 15 V.S.A. § 1031(3), and the PKPA, which was drafted to generally track the UCCJA, intentionally omitted that language, see *L.G. v. People*, 890 P.2d 647, 661-62 (Colo. 1995); *In re L.W.*, 486 N.W.2d 486, 500-01 (Neb. 1992); *State ex rel. Dep't of Human Servs. v. Avinger*, 720 P.2d 290, 292 (N.M. 1986); (2) the purpose of the PKPA is to address the interstate enforcement of child custody decrees, and, in particular, particularly to address child-snatching, and not to interfere with a state's protection of a dependent and neglected child, see *L.G.*, 890 P.2d at 661-62; *In re L.W.*, 486 N.W.2d at 500-01; *Avinger*, 720 P.2d at 292; and (3) the continuing jurisdiction section of the PKPA, § 1738A(d), refers to a contestant, a term defined in § 1738A(b)(2) not to include the state, see *In re L.W.*, 486 N.W.2d at 500-01. None of these rationales suggests that the PKPA should not apply in this visitation dispute between private parties.

¶ 24. For the above reasons, we reject Lisa's argument that the PKPA does not apply to the Virginia parentage decision. We hold that the PKPA applies to this case and does not command the Vermont court to give full faith and credit to the parentage decision of the Virginia court that was issued in violation of the PKPA.

¶ 25. Lisa's second argument is that the PKPA has been superseded by the Defense of Marriage Act (DOMA), 28 U.S.C. § 1738C (2000), and DOMA requires that the Vermont court give full faith and credit to the Virginia decision and order. DOMA reads:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

*Id.* Lisa argues that a Vermont civil union is a relationship between persons of the same sex that is treated as a marriage under Vermont

law and that Janet's right of visitation, if any, arises from that relationship. Thus, she argues that DOMA authorized the Virginia court to reject any right of visitation based on the Vermont court order, and the Vermont court must give full faith and credit to the Virginia order.

¶ 26. The family court concluded that DOMA would not provide Lisa the relief she sought:

> Nor is the application of the PKPA in this case, as Lisa's counsel has suggested, hindered by the more recently enacted Federal Defense of Marriage Act (DOMA).... Whether or not a Virginia court may be permitted under DOMA to decline to give effect to the judicial proceedings in Vermont in a Virginia court is not relevant to the essential question before this court, or before the court of Virginia as a prerequisite for exercising its jurisdiction, of whether this Vermont court had jurisdiction under Vermont law over this dispute before it was filed in Virginia. Clearly Vermont has jurisdiction and therefore the Commonwealth of Virginia's judgment is *not* entitled to full faith and credit.

Janet urges us to affirm on a broader and different ground: that DOMA and the PKPA should be construed to be consistent; this consistent construction would be that DOMA does not apply to custody and visitation orders.

¶ 27. We affirm on the ground employed by the Vermont court. This case is about whether the Vermont court must give full faith and credit to the decision of the Virginia court, and not the reverse. Unlike the PKPA, in no instance does DOMA require a court in one state to give full faith and credit to the decision of a court in another state. Its sole purpose is to provide an authorization *not* to give full faith and credit in the circumstances covered by the statute. Thus, DOMA does not aid Lisa's attack on the Vermont order.

¶ 28. Under Lisa's interpretation, we would be required to give full faith and credit to the Virginia court's decision not to give effect to the fully valid order of the Vermont court. Indeed, if we were to accept that argument, the Vermont biological parent of a child born to a civil union could always move to another state to make a visitation order unenforceable in every state, *including Vermont*. As we discussed above in relation to Lisa's PKPA argument, *supra*, ¶ 19, we held in *Medveskas*, 161 Vt. at 394, 640 A.2d at 546, that we will not give "greater faith and credit" to another state's judgment that is in conflict with a valid judgment of our own courts. Because

we can affirm on this narrow ground, we need not reach the broader question of whether DOMA, and not the PKPA, governs to determine the effect of a Vermont custody or visitation decision based on a civil union.

¶ 29. Lisa's third ground for arguing the PKPA does not apply is that the civil union was void because both Janet and Lisa were residents of Virginia when they entered the civil union in Vermont, and, as a result, Virginia courts did not have to recognize it. We consider this argument in the next section of the opinion and reject it.

¶ 30. In summary, none of Lisa's arguments change our conclusion that this is a straightforward interstate jurisdictional dispute over custody, and the governing law fully supports the Vermont court's decision to exercise jurisdiction and refuse to follow the conflicting Virginia visitation order.

## II. The Validity of the Civil Union

¶ 31. Lisa next argues the civil union of her and Janet is void as a matter of law because it was entered into when both parties were residents of Virginia and would have been void if entered into in Virginia. She then argues that since the civil union is void, the temporary visitation order based upon the civil union is also void. In making these arguments, she relies first upon 15 V.S.A. § 6, which provides:

> A marriage shall not be contracted in this state by a person residing and intending to continue to reside in another state or jurisdiction, if such marriage would be void if contracted in such other state or jurisdiction. Every marriage solemnized in this state in violation of this section shall be null and void.

She argues that because same-sex legal unions are void in Virginia, Vermont must also find their union void. Lisa recognizes that § 6 alone, which applies to marriages, does not void the civil union. As we held in *Baker v. State*, 170 Vt. 194, 201, 744 A.2d 864, 869 (1999), a union between partners of the same gender is not defined by Vermont law as a marriage. The Legislature explicitly codified this holding in 15 V.S.A. § 8. 1999, No. 91 (Adj. Sess.), § 25. Thus, Lisa argues, § 6 applies to civil unions as well as marriages as a result of 15 V.S.A. § 1204(a), a section of the civil union statute, which states:

> Parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether they derive

from statute, administrative or court rule, policy, common law or any other source of civil law, as are granted to spouses in a marriage.

Accordingly, Lisa argues § 1204(a) incorporates § 6 and voids her union to Janet.

¶ 32. The Vermont court did not address these arguments because Lisa failed to raise them. Thus, Janet's first response on appeal is that we should not reach Lisa's arguments on this point because they have not been preserved. Janet also notes that even if § 6 applies to civil unions, whether § 6 would even fit the facts of this case is in dispute. For example, at the time the parties entered into the civil union in 2000, Virginia law prohibited "[a] marriage between persons of the same sex" and made such marriages entered into in another state "void" in Virginia, Va. Code Ann. § 20-45.2 (West 2005), but it was silent on the effect of civil unions. Only in 2004 did Virginia enact a comparable statute prohibiting civil unions. *Id.* § 20-45.3 (effective July 1, 2004). Thus, whether a civil union entered into in Vermont in 2000 would have been void if 15 V.S.A. § 6 applied remains a question. Further, § 6 applies only if the parties are "residing and intending to continue to reside in another state or jurisdiction." The record specifies that Lisa and Janet resided in Virginia at the time of the civil union, but it is silent on their intent for the future.

¶ 33. Lisa argues that despite these issues, we should decide the validity of the civil union because it is jurisdictional. Although we question that characterization, we exercise our discretion to reach the merits because it involves a pure question of law, on which our review is de novo, see, e.g., *Kelly v. Lord*, 173 Vt. 21, 34, 783 A.2d 974, 985 (2001) (exercising discretion to hear appeal from nonfinal judgments), and further involves a matter of public interest.

¶ 34. On the merits, we are guided at the outset by familiar canons of statutory construction. Our overall goal in construing a statute is to implement the intent of the Legislature. *Farris v. Bryant Grinder Corp.*, 2005 VT 5, ¶ 8, 177 Vt. 456, 869 A.2d 131. In pursuing this goal, we normally apply the plain meaning of the statute if it is unambiguous. *Id.* Where there is uncertainty about legislative intent, "we must consider the entire statute, including its subject matter, effects and consequences, as well as the reason for and spirit of the law." *In re Hinsdale Farm*, 2004 VT 72, ¶ 5, 177 Vt. 115, 858 A.2d 249.

¶ 35. Here, we believe that the plain meaning of the civil union statute, 15 V.S.A. § 1204(a), is inconsistent with Lisa's argu-

ment and does not incorporate § 6. Section 1204 plainly addresses the responsibilities of persons who have entered into a civil union and not the eligibility for that status. This plain meaning is reinforced by the fact that the Legislature specifically included another section in the same chapter, entitled "Requisites of a valid civil union," *id.* § 1202, referring to eligibility for civil unions, and did not include residency as one of its requirements. More generally, the statute on which Lisa relies to support her claim that the civil union is void, § 6, is part of chapter 1 of Title 15, which establishes the requirements of marriage. Where the Legislature intended that chapter 1's requirements apply to civil unions, it said so directly by a separate provision of the civil union chapter, see *id.* § 1203 (disallowing parties from entering into civil unions with the same specified relatives the marriage statute also prohibits parties from marrying), or by amending the marriage statute so that it also applied to civil unions, *id.* § 4 (voiding marriages when previous marriage or civil union is still in force). These provisions would be superfluous if § 1204 generally made chapter 1 applicable to civil unions. Accordingly, there is no indication that the Legislature intended to apply chapter 1 generally to civil unions or to apply specific sections beyond those explicitly adopted.

¶ 36. Beyond the statute's plain language, there are other indications that the Legislature did not intend § 6 apply to civil unions. First, it is evident the Legislature expected that nonresidents would obtain civil unions, as it specifically provided that any town clerk in the state could issue a license to applicants "if neither is a resident of the state." 18 V.S.A. § 5160(a). We take judicial notice that Vermont was the first state to offer civil unions. Thus, under Lisa's broad interpretation of 15 V.S.A. § 6, which she applies even to states with no explicit prohibition on civil unions, no resident of another state who intended to remain a resident of that state could have validly entered into a Vermont civil union because no other state allowed civil unions at that time.[2] Section 5160(a) of Title 18 evidences the absurdity of that claim.

¶ 37. Moreover, where the Legislature intended to impose a residency requirement on couples in civil unions — that is, in the case of dissolution — it stated so explicitly. See 15 V.S.A. § 1206 ("The dissolution of civil unions shall follow the same procedures ... that

---

[2] Currently, California has a statute authorizing domestic partnerships, Cal. Fam. Code § 297 (West 2006), and Connecticut has a statute authorizing civil unions, Conn. Gen. Stat. §§ 46b-38aa to 46b-38oo (2006).

are involved in the dissolution of marriage . . ., including any residency requirements."). In addition, the Legislature specifically required town clerks to provide civil union applicants with information to advise them "that Vermont residency may be required for *dissolution* of a civil union in Vermont." 18 V.S.A. § 5160(f) (emphasis added). In this context, we take the absence of an explicit statement that residency would normally be required for civil union formation as a strong indication that the Legislature intended no such requirement.

¶ 38. Finally, the Legislature has charged the Secretary of State and the Commissioner of Health with providing public information about the requirements and procedures of the statute, see 15 V.S.A. § 1207(a) (Commissioner of Health to supply forms); 18 V.S.A. § 5160(f) (Secretary of State to provide information to be handed out by town clerks), and created and charged the Vermont Civil Union Review Commission with implementing a plan "to inform members of the public . . . about the act," 1999, No. 91 (Adj. Sess.), § 40(c). We give some deference to the construction of the applicable statutes by these implementing agencies. *Laumann v. Dep't of Pub. Safety*, 2004 VT 60, ¶ 7, 177 Vt. 52, 857 A.2d 309; *Agency of Natural Res. v. Deso*, 2003 VT 36, ¶ 14, 175 Vt. 513, 824 A.2d 558 (mem.).[3] The Secretary of State has created an online pamphlet, entitled "The Vermont Guide to Civil Unions" (revised Aug. 2005), which states in Part 3 that "[t]here are no residency or citizenship requirements for Vermont Civil Unions." http://www.sec.state.vt.us/otherprg/civilunions/civilunions.html (last visited July 31, 2006). The Commissioner of Health has also posted an online pamphlet entitled "Civil Unions in Vermont: Questions and Answers to Help you Plan your Vermont Civil Union." It states in response to the first question, "Who can form a civil union?," that "[y]ou do not have to be Vermont residents to form a civil union in

---

[3] This might be viewed as an unconventional application of the deference rule because civil union licenses are issued by town clerks and not by the Secretary of State and Commissioner of Health. Under the statutory scheme, however, the town clerks are acting under the guidance and direction of the secretary and commissioner. If the secretary and commissioner misconstrue the statute, the lives of many civil union applicants could be dramatically affected. Indeed, the report of the Vermont Civil Union Review Commission, discussed *infra*, ¶ 39, indicates that if we invalidated the officials' construction of the statutory scheme in favor of Lisa's interpretation, it is likely that the vast majority of civil unions, numbering in the thousands, would be declared void were the provisions of 15 V.S.A. § 6 now applied to civil unions. We find this to be more evidence that we are effectuating the Legislature's intent on this point.

Vermont." http://healthvermont.gov/research/records/civil.pdf (last visited July 31, 2006). Necessarily, these officials have adopted a different construction of the civil union statutes from that urged by Lisa in this case.

¶ 39. Although the Vermont Civil Union Review Commission has not provided additional public commentary, it issued a report in 2002 that stated that 4,371 civil unions had been completed as of January 2002, and that:

> Most civil unions have involved parties who are nonresidents. The proportion of civil unions involving Vermont residents continues to decrease. In July 2000, 29% of civil unions involved Vermont residents. This number dropped to 22% in August and September of 2000, and, currently, 11% of people entering civil unions are Vermonters. Residents from 48 states, the District of Columbia, Canada and several other countries have established civil unions in Vermont. Besides Vermont, the largest numbers of civil union parties have been residents of New York, Massachusetts and California.

Report of the Vt. Civil Union Review Comm'n, Finding 3 (Jan. 2002), http://www.leg.state.vt.us/baker/Final%20CURC%20Report%20for%2 02002.htm (last visited July 31, 2006). It concluded that "Act 91 Is Working As Intended." *Id.*, Conclusion 6. The Commission could not reach that conclusion if it found that the Legislature intended to prohibit nonresidents from entering civil unions in Vermont because their states of residency would not recognize their unions. Further, the Legislature has taken no action in response to the Commission's report, as one might expect if the overwhelming use of civil unions by nonresidents was unintended.

¶ 40. We hold that the Legislature did not intend to apply to civil unions the prohibition on certain nonresidents entering into Vermont marriages. As a result, we hold that the civil union between Lisa and Janet was valid. Accordingly, we reject Lisa's argument that the temporary visitation order is void because the civil union is void.

## III. The Parentage Determination

■ ¶ 41. Lisa's third argument attacks the temporary visitation order on the basis that Janet is not a parent of IMJ.[4] She argues that Janet cannot be a parent of IMJ because she is not biologically connected to her. In making this argument, Lisa looks primarily to the Parentage Proceedings Act, 15 V.S.A. §§ 301-308. Under § 308(4):

> A person alleged to be a parent shall be rebuttably presumed to be the natural parent of a child if . . . (4) the child is born while the husband and wife are legally married to each other.

This statute applies to civil unions by virtue of § 1204(f):

> (f) The rights of parties to a civil union, with respect to a child of whom either becomes the natural parent during the term of the civil union, shall be the same as those of a married couple, with respect to a child of whom either spouse becomes the natural parent during the marriage.

See also *id.* § 1204(d) ("The law of domestic relations, including annulment, separation and divorce, child custody and support, and property division and maintenance shall apply to parties to a civil union.").

¶ 42. Lisa contends that because the Legislature used the word "natural" in § 308(4), it must have intended the presumption of parentage to apply only to a person who is biologically connected to the child. She argues, therefore, that because she is IMJ's biological mother, and Janet is not, Janet cannot be a parent of IMJ. If Janet is not IMJ's parent, Lisa continues, then the family court erred in awarding Janet visitation.

¶ 43. The Vermont court responded to Lisa's argument by holding that, because Lisa gave birth through artificial insemination, the

---

[4] Lisa's argument assumes that the court could not issue a temporary visitation or custody order pending a determination of parentage in a civil union dissolution proceeding. The dissolution proceeding is subject to the same procedures as a divorce proceeding. 15 V.S.A. § 1206; V.R.F.P. 4(a)(1). The Legislature has provided broad authority to award temporary relief in a divorce. 15 V.S.A. § 594a; see also V.R.F.P. 4(c)(2). Generally, the procedures applicable to a divorce are applicable to a parentage action. V.R.F.P. 4(a)(1). Thus, we are not prepared to accept Lisa's assumption. In any event, the facts are generally undisputed, and, as we hold in the text, the issue is one of law so it does not matter when the parentage determination was made in this case.

presumption of parentage contained in § 308 applied to Janet, just as it would have applied to Lisa's husband if she had had one at the time of the birth.

¶ 44. Section 308(4) was not intended to produce the result Lisa advances and is ultimately irrelevant to the circumstances creating parenthood in this case. The presumption provision was added to § 308 quite recently, see 1993, No. 228 (Adj. Sess.), § 13 (adding subsection (4) to 15 V.S.A. § 308), apparently to make the collection of child support easier, see 15 V.S.A. § 293(b) (where presumption applies, it is a "sufficient basis for initiating a support action ... without any further proceedings to establish parentage"). We have examined the legislative history of the statute and can find no indication that it was intended to govern the rights of parentage of children born through artificial insemination or to same-sex partners, or to do anything other than provide a speedy recovery of child support. Thus, to accept Lisa's argument, we would have to find that Lisa's desired effect of § 308(4) is an unintended consequence of a legislative amendment enacted for a different purpose. As explained below, we find § 308(4) does not have that unintended consequence.

¶ 45. Ultimately, we have both a short and a long answer to Lisa's argument regarding the effect of § 308(4), and, because of the public interest in the issue, we provide both. The short answer is that the issue is controlled by this Court's decision in *Paquette v. Paquette*, 146 Vt. 83, 499 A.2d 23 (1985), under which the presumption of parentage contained in § 308 is irrelevant. In *Paquette*, the parties were involved in a divorce and the husband sought custody of both the child born of the marriage and another child born of the wife's prior marriage. The lower court ruled that custody could not be awarded to a stepfather and, on that basis, denied the husband custody of the older child. On appeal, this Court reversed, holding that where the stepparent has assumed the role of a parent with respect to the child — that is, had acted "in loco parentis" — the lower court can give custody to the stepparent, over the opposition of the biological parent, if it finds that it is in the best interest of the child to do so and "the natural parent is unfit or ... extraordinary circumstances exist to warrant such a custodial order." *Id.* at 92, 499 A.2d at 30.

¶ 46. *Paquette* does not explicitly discuss visitation, but its rationale fully applies to visitation as well as to custody. See S. Silverman, *Stepparent Visitation Rights: Toward the Best Interests of the Child*, 30 J. Fam. L. 943, 948 (1992) (characterizing *Paquette* as a step-

parent visitation case). In fact, the concerns expressed about the possible interference with the rights of biological parents are of much less weight in the case of visitation.

¶ 47. Under *Paquette*, regardless of the meaning of 15 V.S.A. § 308(4), Janet has at least the status of a stepparent of IMJ by virtue of § 1204(d) and (f). Assuming extraordinary circumstances are even required for a visitation order, we conclude that extraordinary circumstances are present in this case. The court's findings demonstrate that Janet acted in loco parentis with respect to IMJ as long as Janet and Lisa were together. Thus, our short answer to Lisa's argument is that the visitation order is supported by *Paquette* even if Janet is not considered IMJ's parent under § 308(4).

¶ 48. There is also a longer answer to Lisa's argument that biology must control the parentage issue. We find that Janet has status as a parent, even beyond her stepparent status under *Paquette*. If we were to accept Lisa's opposing position and conclude biology controlled, a child born from artificial insemination would have no second parent — whether that status is sought by a man married to the child's mother or by a woman or man in a civil union with the child's biological parent — unless the putative second parent adopted the child. In fact, the logical extension of Lisa's position that a biological connection is necessary for parentage is that the husband of a wife who bears an artificially inseminated child cannot be the father of that child, just like a civil union spouse cannot be a parent to the child. Such a holding would cause tremendous disruption and uncertainty to some existing families who have conceived via artificial insemination or other means of reproductive technology, and we must tread carefully so that we incur such a consequence only if necessary. As a result, we reach the broader and longer answer to Lisa's argument and conclude that such a holding would be wrong.

¶ 49. We are facing a situation similar to that in *In re B.L.V.B.*, 160 Vt. 368, 628 A.2d 1271 (1993), which was decided before the civil union law and involved a same-gender couple. As in this case, one member of the couple in *In re B.L.V.B.* conceived a child through artificial insemination, and her partner sought to adopt the child to also become a parent. The probate court ruled that the governing statute, which stated that a child's natural parent's rights shall not be affected when the parent's *spouse* adopts the child, required that if the adoption were granted to the same-sex partner, the biological mother's parental rights would be terminated because the adopting

parent was not the biological parent's spouse (or the child's step-parent).

¶ 50. Despite the language of the governing statute, we reversed in that case, holding that the probate court's result was at odds with the intent of the Legislature: "[W]e cannot conclude that the legislature ever meant to terminate the parental rights of a biological parent who intended to continue raising a child with the help of a partner." *Id.* at 373, 628 A.2d at 1274. We stated further:

> When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest. . . .

> As the case law from other jurisdictions illustrates, our paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support.

*Id.* at 375-76, 628 A.2d at 1275-76.

¶ 51. The disruption that would be caused by requiring adoption of all children conceived by artificial insemination by nonbiological parents is particularly at variance with the legislative intent for civil unions. The Legislature's intent in enacting the civil union laws was to create legal equality between relationships based on civil unions and those based on marriage. The Legislature added a separate section on the construction of the civil union statutes that provides in part:

Treating the benefits, protections and responsibilities of civil marriage differently from the benefits, protections and responsibilities of civil unions is permissible only when clearly necessary because the gender-based text of a statute, rule or judicial precedent would otherwise produce an unjust, unwarranted, or confusing result, and different treatment would promote or enhance, and would not diminish, the common benefits and protections that flow from marriage under Vermont law.

1999, No. 91 (Adj. Sess.), § 39(a). The result of Lisa's statutory argument would be to produce separate benefits and protections for couples in civil unions. Under her argument, no partner in a civil union could be the parent of a child conceived by the other partner without formally adopting that child.

¶ 52. As in *In re B.L.V.B.*, we face the problem here of a family with a child created by artificial insemination, and the Legislature has not dealt directly with new reproductive technologies and the families that result from those technologies. Nonetheless, the courts must define and protect the rights and interests of the children that are part of these families. See *In re B.L.V.B.*, 160 Vt. at 376, 628 A.2d at 1276; *In re Estate of Kolacy*, 753 A.2d 1257, 1263 (N.J. Super. Ct. Ch. Div. 2000) (finding that even though child was conceived via assisted reproductive technology, "once a child has come into existence, she is a full-fledged human being and is entitled to all of the love, respect, dignity and legal protection which that status requires"). We express, as many other courts have, a preference for legislative action, see, e.g., *In re M.J.*, 787 N.E.2d 144, 150 (Ill. 2003); *Culliton v. Beth Israel Deaconess Med. Ctr.*, 756 N.E.2d 1133, 1139 (Mass. 2001), but in the absence of that action, we must protect the best interests of the child.

¶ 53. With this background in mind, we turn back to § 308(4). The purpose of the statute is to create a rebuttable presumption, the main effect of which is to assign the burden of production. *Godin v. Godin*, 168 Vt. 514, 530, 725 A.2d 904, 915 (1998) (Dooley, J., dissenting). Thus, the presumption serves the purpose of allowing more summary support actions even in the absence of a parentage adjudication, which effectively eases child support decisions. See 15 V.S.A. § 293(b) (where presumption of parentage under § 308 applies, a support action against the presumed parent may be filed without a prior parentage adjudication). Because the statute creates only a

presumption, however, it does not prevent proof of the fact in issue through other means. Thus, if the presumption did not apply,[5] the only effect in this case would be that Janet would have the burden of production to prove parenthood, a burden she assumed in presenting her case to the family court. Where the presumption cannot apply, it does not mean the individual is not a parent; it simply means we must look to see whether parentage exists without the use of the presumption — the same way we would have determined parentage before the adoption of § 308(4).

¶ 54. Lisa focuses almost exclusively on the word "natural," finding in its use the legislative intent that only biological parents can be parents for purposes of the parentage statute.[6] We find this to be an overly broad reading of the language. The parentage act does not include a definition of "parent." It does not state that only a natural parent is a parent for purposes of the statute. In fact, the statute is primarily procedural, leaving it to the courts to define who is a parent for purposes of a parentage adjudication. Given its origin and history, it is far more likely that the legislative purpose was to allow for summary child support adjudication in cases where biological parenthood is almost indisputable.

¶ 55. We reach then the ultimate question — whether Janet is a parent within the meaning of the parentage act — without consideration of § 308, which is irrelevant to both sides of the argument in this case. We have held that the term "parent" is specific to the context of the family involved. For instance, in *In re S.B.L.*, 150 Vt. 294, 302, 554 A.2d 1078, 1083-84 (1988), we held that the biological father of a child born out of wedlock is not a "parent" for purposes of 14 V.S.A.

---

[5] As we noted in *Godin*, the presumption of paternity of the husband of the mother originated at common law. 168 Vt. at 521-22, 725 A.2d at 909-10 (citing numerous historical common-law conclusions and principles for finding parentage as to both legal spouses for the child born in that union). Prior to the adoption of the recent statute, we did not have the opportunity to determine whether Vermont would recognize the common-law presumption. In view of the limited purpose of the statute — to facilitate the collection of child support — it is possible that any common-law presumption would survive. Nonetheless, we need not rely on a presumption here because the court had sufficient facts before it to determine that Janet was the parent of IMJ without the aid of a presumption.

[6] Lisa's argument presumes that "natural" means biological. She bases that argument on our opinion in *Godin*, although that decision does not contain that holding explicitly. We note that other courts have not always equated these terms. E.g., *In re Nicholas H.*, 46 P.3d 932, 937 (Cal. 2002).

§ 2645, one of our guardianship statutes. Again, we stress that the difficulty in interpretation in this context arises because the Legislature has not addressed assisted reproductive technologies. Thus, we cannot discern in the parentage statutes any helpful legislative intent for such familial circumstances.

¶ 56. Many factors are present here that support a conclusion that Janet is a parent, including, first and foremost, that Janet and Lisa were in a valid legal union at the time of the child's birth. The other factors include the following. It was the expectation and intent of both Lisa and Janet that Janet would be IMJ's parent. Janet participated in the decision that Lisa would be artificially inseminated to bear a child and participated actively in the prenatal care and birth. Both Lisa and Janet treated Janet as IMJ's parent during the time they resided together, and Lisa identified Janet as a parent of IMJ in the dissolution petition. Finally, there is no other claimant to the status of parent, and, as a result, a negative decision would leave IMJ with only one parent. The sperm donor was anonymous and is making no claim to be IMJ's parent. If Janet had been Lisa's husband, these factors would make Janet the parent of the child born from the artificial insemination. See generally *People v. Sorensen*, 437 P.2d 495 (Cal. 1968). Because of the equality of treatment of partners in civil unions, the same result applies to Lisa. 15 V.S.A. § 1204.

¶ 57. Virtually all modern decisions from other jurisdictions support this result, although the theories vary. See, e.g., *Brown v. Brown*, 125 S.W.3d 840, 844 (Ark. Ct. App. 2003) (husband estopped from denying child support where husband knew wife was using artificial insemination to have child); *Sorensen*, 437 P.2d at 498-500 (husband is lawful father of child conceived through artificial insemination born during marriage to child's mother); *In re Buzzanca*, 72 Cal. Rptr. 2d 280, 286-87 (Ct. App. 1998) (finding virtually all decisions hold husband to be parent based on his consent to artificial insemination); *In re M.J.*, 787 N.E.2d at 152 (mother of children conceived through artificial insemination may seek to establish paternity of man with whom she had ten-year intimate relationship based on theories of "oral contract or promissory estoppel"); *Levin v. Levin*, 645 N.E.2d 601, 604-05 (Ind. 1994) (husband who orally consented to artificial insemination of wife estopped from denying fatherhood of child); *R.S. v. R.S.*, 670 P.2d 923, 929 (Kan. Ct. App. 1983) (husband who orally consented to artificial insemination of wife estopped from denying fatherhood); *State ex rel. H. v. P.*, 457

N.Y.S.2d 488, 492 (App. Div. 1982) (wife estopped from denying husband's paternity where she fostered parent-child relationship); *Brooks v. Fair*, 532 N.E.2d 208, 212-13 (Ohio Ct. App. 1988) (public policy disallows wife from denying paternity of husband where parties agreed during marriage to conceive via means of artificial insemination); *In re Baby Doe*, 353 S.E.2d 877, 878 (S.C. 1987) (husband is legal father of child where he consented to artificial insemination of wife during marriage); see generally A. Stephens, Annotation, *Parental Rights of Man Who Is Not Biological or Adoptive Father of Child But Was Husband or Cohabitant of Mother When Child Was Conceived or Born*, 84 A.L.R.4th 655 (1991). Some courts find the party a parent as a result of contract theory or estoppel. E.g., *R.S.*, 670 P.2d at 928. Estoppel is often invoked because of the strong reliance interests that arise from consensual artificial insemination. Other courts reach the result more as a matter of policy, particularly stressing the adverse consequences of leaving the child without a parent despite the clear intention of the parties. E.g., *Brooks*, 532 N.E.2d at 212-13. We adopt the result in this case as a matter of policy, and to implement the intent of the parties.

¶ 58. This is not a close case under the precedents from other states. Because so many factors are present in this case that allow us to hold that the nonbiologically-related partner is the child's parent, we need not address which factors may be dispositive on the issue in a closer case. We do note that, in accordance with the common law, the couple's legal union at the time of the child's birth is extremely persuasive evidence of joint parentage. See *People ex rel. R.T.L.*, 780 P.2d 508, 515 n.11 (Colo. 1989) ("We acknowledge that the presumption that a child born during wedlock is the legitimate child of the marriage was one of the strongest presumptions known to the common law."); *Cicero v. Cicero*, 395 N.Y.S.2d 117, 117 (App. Div. 1977) (presumption of legitimacy attached to "issue of the marriage"); *LC v. TL*, 870 P.2d 374, 380 (Wyo. 1994) ("The presumption of legitimacy is one of the strongest in law."); see also *Godin*, 168 Vt. at 522, 725 A.2d at 910 ("Thus, the State retains a strong and direct interest in ensuring that children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern over a child's biological origins.").

¶ 59. Lisa raises three additional reasons why we cannot affirm the temporary visitation award. First, she argues that awarding Janet visitation, without a finding that Lisa is unfit to

parent, interferes with her exclusive constitutional right to parent her child. See *Troxel v. Granville*, 530 U.S. 57, 72-73 (2000) (indicating fundamental due process right of parents to make child rearing decisions). This argument was not adequately raised below and has been waived. See *Will v. Mill Condo. Owners' Ass'n*, 2004 VT 22, ¶ 4, 176 Vt. 380, 848 A.2d 336 (rejecting claim that mere mention of argument in one pretrial memorandum preserved issue for appeal). In any event, we reject it. Janet was awarded visitation because she is a parent of IMJ. Lisa's parental rights are not exclusive. See *In re L.B.*, 122 P.3d 161, 178 (Wash. 2005).

 ¶ 60. We have a similar response to Lisa's argument that Janet's parental status must be determined under Virginia law. Again, the argument was not preserved below. See *Adams v. Adams*, 2005 VT 4, ¶ 15, 177 Vt. 448, 869 A.2d 124 (arguments not raised below are not preserved for appeal). In any event, we also reject this argument. We have adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 287 (1971) in determining choice-of-law questions. *Id.* (law of the state with the most significant relationship to the child and parent determines legitimacy); see *Myers v. Langlois*, 168 Vt. 432, 434, 721 A.2d 129, 130 (1998). As we held in the first section, the Vermont court had jurisdiction to adjudicate custody and visitation of IMJ under both the PKPA and the UCCJA. Although these acts primarily determine jurisdiction, their provisions are such that they establish the state with the most significant relationship to a child custody or visitation dispute. *Stubbs v. Weathersby*, 892 P.2d 991, 997-98 (Or. 1995). Accordingly, we conclude that where jurisdiction is exercised consistent with the PKPA and UCCJA, the law of the forum state is applicable. In this case, as discussed in depth *supra*, ¶¶ 9-18, Vermont had jurisdiction under both statutes, and, accordingly, Vermont law applies here.

¶ 61. In reaching this conclusion, we do not hold that there is an actual conflict between the law of Vermont and that of Virginia with respect to the power of the court to award visitation in cases involving same-gender partners. The parties have not pointed to any Virginia cases on point, and we have not found any. We do note, however, that a growing number of courts have recognized parental rights in a same-gender partner of a person who adopts a child or conceives through artificial insemination. See *Elisa B. v. Super. Ct.*, 117 P.3d 660, 670 (Cal. 2005) (same-gender partner is presumed mother of twins conceived by artificial insemination and is responsi-

ble for child support); *In re E.L.M.C.*, 100 P.3d 546, 562 (Colo. Ct. App. 2004) (same-gender partner who is psychological parent of child adopted by other partner may be awarded joint parental responsibilities); *C.E.W. v. D.E.W.*, 845 A.2d 1146, 1151-52 (Me. 2004) (court may award parental rights and responsibilities to same-gender partner who is de facto parent of child); *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 892-93 (Mass. 1999) (probate court can provide visitation to same-gender partner of biological mother who is de facto parent of child); *V.C. v. M.J.B.*, 748 A.2d 539, 552-54 (N.J. 2000) (same-gender partner who is a psychological parent to child may be awarded custody of, or visitation with, the child); *T.B. v. L.R.M.*, 786 A.2d 913, 920 (Pa. 2001) (where same-gender partner is in loco parentis with consent of child's biological mother, court may award partial custody or visitation); *Rubano v. DiCenzo*, 759 A.2d 959, 976 (R.I. 2000) (court may award visitation to same-gender partner based on theory of estoppel); *In re L.B.*, 122 P.3d at 176 (same-gender partner who is de facto parent has same right to custody as biological mother); *In re H.S.H.-K.*, 533 N.W.2d 419, 435-37 (Wis. 1995) (same-gender partner with parent-like relationship with child can be awarded visitation, but not custody). In these cases, there was no marriage or civil union between the partners. This result was endorsed in 2000 by the American Law Institute. *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 2.03 cmt. (b)(iii), at 114. It may be that the Virginia courts will follow this trend.

¶ 62. Lisa next argues that the court erred by awarding visitation without first determining parentage. Temporary relief requests in divorce or dissolution proceedings must be heard and decided promptly. 15 V.S.A. § 594a. Necessarily, a temporary order will not be based on the full record required to support a final order. A speedy decision was required in this case to allow Janet to have some contact with IMJ, pending resolution of the dispute over custody and visitation. Meanwhile, Lisa went through three lawyers during the early stage of the dissolution action. Her complaint alleged that Janet was a parent of IMJ, and she maintained that position through the first day of the temporary relief hearing. Indeed, her counsel stated on the record that Lisa waived any claim that Janet was not a parent of IMJ. Thereafter, with a new lawyer, she attempted to change her position, to roughly the position she espouses here. She sought to delay the temporary relief proceeding while she adjudicated whether Janet was a parent, and she argued that the court should give no interim relief until parenthood was fully

resolved. We believe the family court acted within its broad discretion in awarding temporary visitation as it did, even if it could not make a final determination of parentage. See *id.* (court can make such orders pending final hearing as it could upon final hearing); V.R.F.P. 4(c)(2).

¶ 63. In any event, the timing of the court's action was harmless in this case. The family court eventually ruled that Janet had parental status with respect to IMJ, a ruling we have affirmed. The relevant facts are largely undisputed and were before the court when it issued the temporary order. Lisa sought to delay the ruling on the basis that Janet was not the biological mother of IMJ, a fact that is undisputed and is not determinative. Thus, the timing of the court's action has no significance at this time. The Commonwealth of Virginia's judgment regarding parentage is *not* entitled to full faith and credit.

## IV. Contempt

¶ 64. Finally, Lisa argues that we should reverse the contempt determination because it is unsupported by the record. The transcripts show that on May 26, 2004, the trial judge granted Janet parent-child contact via a bench ruling issued on the record, and Janet's lawyer was to prepare a written order. The oral order provided for visitation for the weekends of June 4-6 and June 18-20, the week in July starting July 25, and one week per month in Vermont starting August 2004. The order also provided for Janet to have daily telephone contact with IMJ. At the hearing, Lisa explicitly stated that she waived any objection to the visitation on June 4-6, June 18-20, and for the week in July beginning July 25: "[W]e have no objection to the visitation proposed [regarding these dates] . . . ." Janet's lawyer filed the proposed order on May 28, but it was not signed and filed until June 17. Meanwhile, on June 9, Lisa filed a motion to reconsider the order, saying that it had been "issued from the bench." The written order, requiring the same visitation as previously had been ordered from the bench, was served on Lisa on June 25.

¶ 65. On June 5, 2004, despite the fact that the order had not yet been reduced to writing, Lisa complied with the visitation order for that weekend. Nonetheless, although the parties' versions of the reasons for the lack of visitation differ, Janet was not able to see the child as ordered on the weekend of June 18 or during the week of July 25. Janet has not had parent-child visitation with IMJ since the

weekend of June 4, 2004. Both the oral and written orders also provided that Janet could have telephone contact with IMJ "once per day," but Lisa did not allow this contact, and it did not occur. Janet moved for a determination that Lisa was in contempt of the court order, and the court held a hearing at which both Janet and Lisa testified. Lisa acknowledged at the contempt hearing that, even before an order had been issued by the Virginia court, she did not agree with the family court's visitation order, and had no intention of complying with it. On September 2, the Vermont court found that Lisa had failed to comply with the parent-child contact requirements, specifically finding that "Lisa has wilfully refused to comply with this court's order regarding visitation since mid-June, solely because she does not like it."

¶ 66. Lisa makes no argument on appeal to justify her refusal to allow telephone contact between Janet and IMJ. At the contempt hearing, Lisa suggested that the telephone contact did not occur because the times during which Janet attempted to contact the child were inconvenient; Janet, in turn, stated that her numerous and repeated attempts always resulted in busy signals, rebuffs by Lisa, and answering machines. Lisa acknowledges that Janet and IMJ did not actually converse on the telephone after the weekend of June 18, as was required per the temporary order.

¶ 67. Lisa argues on appeal that she did not violate the order with respect to the July visitation because Janet appeared at her home when she knew Lisa and IMJ would be at church. Again, the court's order was explicit that Janet was entitled to visitation starting on July 25, 2004, and the record is clear that the ordered visitation did not occur despite Janet's attempt.

¶ 68. With respect to the June visitation, Lisa makes a legal argument that she had no obligation to provide visitation because the written order had not been served upon her. Lisa's argument is disingenuous. The family court made the temporary visitation order orally from the bench and on the record on May 26, 2004. Lisa's presence at that hearing, with representation by counsel, is undisputed. Furthermore, at the hearing, Lisa explicitly stated through her attorney that she did not object to the June and July visitation dates. Lisa then further acknowledged the oral visitation order in her motion to set it aside. Lisa has not argued, and cannot argue, that she had no notice of the court's visitation order, nor does she argue that it did not provide for visitation during the weekend of June 18.

She argues only that a written order had not yet been served as of the June 18 visitation date.

¶ 69. We can find no requirement that a temporary visitation order be in writing, beyond the writing created by the transcript of an oral order placed on the record. We have recently affirmed a contempt adjudication based on an oral visitation order. See *Root v. Root*, 2005 VT 93, ¶ 13, 178 Vt. 634, 882 A.2d 1202 (mem.) (affirming contempt based on violation of oral order that reiterated preexisting obligation parent conceded was not followed); see also 15 V.S.A. § 603 (authorizing contempt proceedings for disobeying "lawful order," without reference to manner of order). We similarly conclude that the oral order and full notice to Lisa supported the contempt adjudication in this case.

¶ 70. Apparently, Lisa's response to her failure to comply with the August visitation provisions is that the Virginia decision superseded the Vermont order. We have rejected that argument as a matter of law. Moreover, Lisa could have complied with the Vermont order without violating any order from the Virginia court.

¶ 71. The family court found that Lisa had "wilfully refused to comply with [its] order regarding visitation," and we find no reason to overturn that finding. See *Payrits v. Payrits*, 171 Vt. 50, 52-53, 757 A.2d 469, 472 (2000) (family court findings will not be overturned unless clearly erroneous). For the above reasons, we reject Lisa's arguments that the family court erred in finding her in contempt and remand for the imposition of sanctions.

¶ 72. In conclusion, the family court properly assumed jurisdiction of the action to dissolve the civil union between Lisa and Janet. The civil union was not void. The court properly found that it had jurisdiction to issue a temporary order providing Janet visitation with IMJ, and it was not required to recognize and enforce a conflicting decision of the Virginia court. Finally, the record supports the family court's decision that Lisa is in contempt of court for willfully violating the temporary visitation order.

*Affirmed and remanded.*