2003 VT 36

**AGENCY OF NATURAL RESOURCES v. Richard DESO**

[824 A.2d 558]

No. 01-532

¶ 1. March 27, 2003. Respondent Richard Deso appeals an order of the environmental court fining him $200,474 (reduced to $100,000 pursuant to 10 V.S.A. § 8010(c)) for operating a gas station for eighteen months without installing a Stage II vapor recovery system as required by Vermont's Air Pollution Control Act, 10 V.S.A. §§ 551-576, and Air Pollution Control Regulations, Stage II Vapor Recovery Controls at Gasoline Dispensing Facilities § 5-253.7. Deso argues that in calculating the penalty the court erred by (1) improperly counting as an economic benefit of his misconduct $161,264 in profits earned from the sale of gasoline without an approved emission control system; (2) incorrectly determining that the violation, which ceased in 1999, was a "continuing violation" and thus subject to a $100,000 fine instead of $25,000 maximum penalty; and (3) including $5,000 to replace underground pipes as part of Deso's avoided costs despite the State's failure to produce evidence at trial that the pipes had failed while Deso owned the gas station. We affirm in part and reverse in part.

¶ 2. Vermont regulations require all gasoline dispensing facilities with an annual throughput of 400,000 or more gallons per year to install a Stage II vapor recovery system to capture harmful volatile organic compounds that would otherwise escape into the atmosphere when vehicle gas tanks are filled. See Air Pollution Control Regulations, Stage II Vapor Recovery Controls at Gasoline Dispensing Facilities, 7 Code of Vt. Rules § 5-253.7(a)-(d), at 12 031 001 – 36.1-36.2. Under the regulatory schedule, any gas station that sells 1,200,000 or more gallons per year must cease all gasoline transfers after December 31, 1997 unless and until an approved Stage II system is installed. *Id.* § 5-253.7(c)(1), (g)(1), at 12 031 001 – 36.1, 36.5.

¶ 3. Deso owned and operated a self-service gas station in St. Albans from August 31, 1990 until he sold the station to Bradford Oil on June 30, 1999. During that time, he installed underground return piping for a gravity-feed Stage II vapor recovery system, but never installed the above ground components. Shortly after the sale, tests by the new owner showed that the underground pipes had malfunctioned and needed to be replaced.

514

¶ 4. A year later, the Secretary of the Agency of Natural Resources (ANR) issued an administrative order and imposed a $27,050 penalty pursuant to the state's Uniform Environmental Law Enforcement Act (UELEA), 10 V.S.A. §§ 8001-8018, finding that Deso had (1) submitted false written reports to the Air Pollution Control Division regarding gasoline sales; (2) failed to pay the proper petroleum assessment fees, and (3) failed to install a Stage II vapor recovery system. After Deso requested a hearing before the environmental court pursuant to § 8012(a), the Secretary amended the administrative order by raising the assessed penalty to $44,000 and reserving the right to augment the penalty based on evidence to be presented at the hearing regarding the amount of economic benefit Deso gained from the violations.

¶ 5. Based on the evidence at the hearing, the environmental court found that Deso had substantially underreported his actual gasoline sales, failed to pay the petroleum assessment fee on the actual sales volume, and knowingly operated his gas station without a Stage II vapor recovery system from January 1, 1998 until June 30, 1999. The court determined that during those eighteen months approximately 14,627 pounds of volatile organic compounds were released into the air. The court also found that the original underground piping was either not installed properly in 1994, or had failed by the time Deso sold the station in the summer of 1999.

¶ 6. Pursuant to 10 V.S.A. § 8012(b)(4), the environmental court reviewed anew the penalty to be assessed against Deso, using the eight criteria set forth at § 8010(b). Regarding Deso's failure to install the required Stage II vapor recovery system, the court determined that Deso gained two types of economic benefits. First, the court held that Deso gained ten cents per gallon profit, or $161,264, by illegally selling gasoline between January 1, 1998 and June 30,

1999. Second, the court determined that Deso benefitted by avoiding the costs of installing and maintaining the vapor recovery system, including $8,070 to install the above ground components and $5,000 to dig up and replace the faulty underground piping. Pursuant to § 8010(b)(6), the court assessed $26,140, or twice the avoided costs. The court further determined that Deso knew or had reason to know the violation existed, and that it caused an actual impact on the environment and a potential for harm to the health of users and neighbors of the facility, but assessed no penalty for these factors. In total, the court fined Deso $200,474 for selling gasoline without a Stage II vapor recovery system, $5,000 for submitting false written reports, and $4,800 for underpaying the proper petroleum assessment fee. Pursuant to § 8010(c), the court reduced the total penalty to $100,000. Deso now appeals the penalty imposed for his violation of the Stage II regulation.

I.

¶ 7. Deso's first contention is that the court erred by determining that his so-called "wrongful profits" — $161,264 earned from the sale of gasoline without an approved emission control system — was an economic benefit gained from the violation. We agree. In calculating the amount of a penalty under UELEA, the environmental court must consider all of the statutory criteria set forth in § 8010(b), including "the economic benefit gained from the violation." 10 V.S.A. § 8010(b)(5); *Agency of Natural Res. v. Godnick*, 162 Vt. 588, 598, 652 A.2d 988, 994 (1994). Although the term "economic benefit" is not defined in § 8010(b)(5), it is clear from the purpose of UELEA that the goal of the economic benefit analysis is to "prevent the unfair economic advantage obtained by persons who operate in violation of environmental laws." 10 V.S.A. § 8001(2); cf. *United States v. Mun. Auth. of Union Township*, 150

F.3d 259, 263 (3d Cir. 1998) (the aim of the economic benefit criteria in Clean Water Act is to recoup any benefits a violator gained by breaking the law and which gave the violator an advantage vis-a-vis its competitors).

¶ 8. At the time he became subject to the regulations, Deso had at least two means of compliance: spending $13,070 to install a Stage II vapor recovery system, or the vastly more expensive alternative of ceasing production altogether, which the court found would mean forgoing $161,264 in profits. Economic principles, normal business behavior, and common sense suggest that a rational business would choose to install the required equipment. Thus, the unfair economic advantage Deso gained over his competitors is the savings gained by not installing an approved Stage II vapor recovery system. Using a wrongful profits analysis significantly overinflates the actual economic benefit to the violator; rather than leveling the playing field, it puts him or her at a marked disadvantage. See R. Fuhrman, et al., *Consideration of "Wrongful Profits" in Environmental Civil Penalty Cases*, 29 Env't Rep. 1010, 1011 (1998) ("economic benefit calculation must be based on the compliance choice a rational business would make and should reflect the least costly means of compliance"); see also M. McGuire, *Muddying the Waters: "Wrongful Profits" as a Measure of Economic Benefit to Violators of the Clean Water Act in the Wake of United States v. Union Township*, 9 Dick. J. Envtl. L. & Pol'y 361, 378 (2000) ("The wrongful profits analysis may serve to over-inflate the actual enjoyed benefit of noncompliance.").

¶ 9. ANR argues that our prior cases affirm the view that any profit realized from a prohibited activity is properly defined as an economic benefit under 10 V.S.A. § 8010(b)(5). See *Sec'y v. Earth Constr., Inc.*, 165 Vt. 160, 165-66, 676 A.2d 769, 773 (1996) (profit from sale of crushed rock extracted prior to obtaining Act 250 permit properly included as an economic benefit of the violation); *Agency of Natural Res. v. Bean*, 164 Vt. 438, 445-46, 672 A.2d 469, 472 (1995) (affirming penalty for "all economic gain," including both profits and delayed and avoided costs, resulting from mobile home park constructed in violation of and prior to obtaining final Act 250 permits); *Godnick*, 162 Vt. at 597, 652 A.2d at 994 (affirming economic benefit calculation including both profits and delayed costs that resulted from using newly constructed warehouse prior to obtaining final Act 250 permits). These cases, however, involved the construction of new facilities, and not the retrofitting of existing facilities. By using these facilities before receiving final permits, the violators enjoyed an income stream sooner than a competitor would who waited until they were in full compliance before startup. Rather than wrongful profits, the income gained by premature operation is properly characterized as advanced profits, the corollary of delayed costs. Such profits qualify as an unfair competitive advantage and, therefore, as an economic benefit of the violation. See Environmental Conservation, Ch. 20 — Environmental Administrative Penalty Rules, 6 Code of Vt. Rules § 104, at 12 030 002-3 – 002-4 ("Economic benefit may include the estimated net income or net gain realized by a respondent through the use of facilities before all required environmental permits are obtained."). Therefore, ANR is incorrect. Not all profits gained through a violation are necessarily an economic benefit of the violation. But when the violation gives the violator a competitive advantage, such profits are an economic benefit subject to penalty by confiscation. See 10 V.S.A. §§ 8001(2), 8010(b)(5).

¶ 10. ANR also warns that disgorging companies of profits earned by ignoring Vermont's environmental programs is necessary to deter others from committing similar violations. While we agree

that such a deterrent may be necessary — indeed, Vermont's environmental programs would cease to function if permittees were allowed to unilaterally disregard permit requirements — for the reasons above we do not think so-called "wrongful profits" can be calculated as an economic benefit. Rather, we note that 10 V.S.A. § 8010(b)(6) provides for penalties in order to achieve deterrence, and that the environmental court had the discretion to set Deso's penalty at the same level based on other § 8010(b) factors without relying on an incorrect theory of economic benefit. See *Agency of Natural Res. v. Duranleau*, 159 Vt. 233, 239-40, 617 A.2d 143, 147 (1992) (environmental court has broad discretion to determine how each criterion should affect the amount of penalty imposed).

¶ 11. Generally, the calculation of a final penalty under UELEA, particularly the calculation of economic benefit, will be imprecise. See *Pub. Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 80 (3d Cir. 1990) (the determination of economic benefit or other factors does not require an elaborate or burdensome evidentiary showing; reasonable approximations of economic benefit will suffice). There must be at least some evidence of cause and effect between the misconduct and an unfair economic advantage gained from the misconduct — for example, if Deso had gained higher profit margins or increased market share by selling cheaper gas. See *Agency of Natural Res. v. Handy Family Enters.*, 163 Vt. 476, 486, 660 A.2d 309, 315 (1995) (reversing penalty of two and a half percent of a restaurant's gross profits because no evidence supported use of the percentage or how the restaurant benefitted from Act 250 violation). In this case, there was insufficient evidence to determine that all profits Deso earned while in noncompliance were an economic benefit of the violation. Thus, we reverse the penalty determination and remand to the environmental

court for consideration consistent with this order.

## II.

¶ 12. Deso next argues that the environmental court exceeded the maximum penalty allowable under UELEA. He contends that 10 V.S.A. § 8010(c) limits penalties for violations of Vermont's Air Pollution Control Regulations to $25,000 per violation, and that the statute's $10,000 per day additional allowance for continuing violations applies only to violations that continue after the initial penalty is assessed, not, as here, to violations that ceased prior to notice of violation. Since this claim was not raised before the environmental court, it is not preserved for our review. *Earth Constr., Inc.*, 165 Vt. at 165, 676 A.2d at 773 (Court will not address issues not raised in environmental court). Because the question may arise on remand we address it now.

¶ 13. UELEA provides that as part of an administrative order:

A penalty of not more than $25,000.00 may be assessed for each determination of violation. In addition, if the secretary determines that a violation is continuing the secretary may assess a penalty of not more than $10,000.00 for each day the violation continues. The maximum amount of penalty assessed under this subsection shall not exceed $100,000.00.

10 V.S.A. § 8010(c). Deso asserts that by using the present tense in the phrase "is continuing" and the word "continues," the Legislature intended to restrict application of the $10,000 per day allowance solely to active, ongoing violations. Deso would thus interpret the second sentence of § 8010(c) as a contempt provision, authorizing an additional fine of not more than $10,000 per day to be levied against violators who persist in their misconduct

after receiving notice of violation and penalty. ANR asserts that a continuing violation under § 8010(c) means any violation that persists more than one day, and that notice of penalty is not required. We find that the latter is the proper construction of the statute.

¶ 14. References to continuing violations appear in almost fifty penalty statutes in Vermont, yet none define "continuing violation" or a "violation that is continuing." ANR's Environmental Administrative Penalty Rules interpreting § 8010(c) provide a definition:

> Continuing Violation: The Secretary may consider *any violation* of a statute listed in 10 V.S.A. Section 8003(a) or a rule promulgated under such statute or a condition of a related permit, order, or assurance of discontinuance *that continues longer than one day* as a continuing violation subject to additional penalties for each day of continuance of the violation.

6 Code of Vt. Rules § 106, at 12 030 002-4 (emphasis added). We conclude that the highlighted portion of this definition is correct for three reasons. First, an administrative agency's interpretation of a statute within its area of expertise is presumed to be correct, valid, and reasonable. *In re Prof'l Nurses Serv., Inc.,* 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996). Second, other states consistently use continuing violation provisions in penalty statutes, not as a contempt mechanism, but rather as a term of art to authorize cumulative penalty assessments for an ongoing offense. See, e.g., *3B TV Inc. v. State,* 794 So. 2d 744, 750 (2001) (Fla. Dist. Ct. App. 2001) ("When the Florida Legislature has intended to permit a penalty to be assessed on a daily basis, or to define each day of continuing conduct as a separate violation, it has expressly so provided."); *Am. Transit*

*Ins. Co. v. Corcoran,* 565 N.E.2d 485, 487 (N.Y. 1990) ("Pyramiding of penalties, i.e., treating continuing violations as separate daily transgressions, has been upheld only where cumulative penalties are expressly authorized by statute."). Third, we note that other jurisdictions considering nearly identical statutes have reached the same result. See, e.g., *Comm'r of Envtl. Prot. v. Conn. Bldg. Wrecking Co.,* 629 A.2d 1116, 1129 (Conn. 1993) (continuing violation includes the number of days debris was illegally deposited in a wetland as well as the subsequent period in which the debris remained in the wetland); *In re Russet Valley Produce, Inc.,* 904 P.2d 566, 571 (Idaho 1995) (repeated mislabeling of shipments of potatoes over a two-week period is a two week "continuing violation" of the state's labeling laws). Therefore, we conclude that the Legislature intended "continuing" in 10 V.S.A. § 8010(c) to mean any violation that lasts longer than one day.

¶ 15. This does not, however, answer the question of whether prior notice is required under § 8010(c) before cumulative penalties may be assessed. We conclude that notice is not required. First, when the Legislature intends that a violator be on notice before cumulative penalties can be assessed, it has provided so expressly. See, e.g., 6 V.S.A. § 1107 (pesticide control) ("[I]n the case of a continuing violation, the fine for each day's continuance thereof shall be increased by 10 percent *over the amount accrued during* the previous day starting from the day the violator is served with notice of the violation."); 10 V.S.A. § 1025(a) (stream flow regulation) ("In the case of a continuing violation, each day's continuance thereof may be deemed a separate offense, starting from the day the violator is served with notice of the violation."); 10 V.S.A. § 1384 (interstate water pollution control compact) ("In the case of a continuing violation, each day's continuance after notification by a law enforcement

officer shall be considered an additional offense for which a person shall be fined not more than $100.00 for each day's offense, in addition to the penalty imposed for a single violation."). By contrast, § 8010(c), like Vermont's other environmental control statutes, does not require notice. For example, these statutes state only that "in the case of a continuing violation, each day's continuance may be deemed a separate and distinct offense." See, e.g., 10 V.S.A. § 568(a) (air pollution control); 10 V.S.A. § 6612(c) (solid and hazardous waste management); 10 V.S.A. § 1275(a) (water pollution control). Given the express statutory requirement of notice in certain penalty provisions, the absence of similar language in 10 V.S.A. § 8010(c) demonstrates a legislative intent not to require notice here. See *State v. LeBlanc*, 171 Vt. 88, 92, 759 A.2d 991, 993 (2000) (Court will not expand a statute "by adding words that we presume the Legislature intentionally omitted"). Reinforcing this conclusion is the fact that chapter 211 of UELEA, which provides for civil enforcement of environmental statutes in superior court, contains a similar continuing violation provision that does not include a notice requirement. See 10 V.S.A. § 8221(b)(6) ("A civil penalty of not more than $50,000.00 may be imposed for each violation. In addition, in the case of a continuing violation, a penalty of not more than $25,000.00 may be imposed for each day the violation continues.").

¶ 16. Second, the legislative history of UELEA evinces an intent not to require notice. As originally introduced in 1989, § 8010(c) provided that "in the case of a continuing violation, each day's continuance may be deemed a separate and distinct offense." 1989, S. 54 (Vt. Bien. Sess.). The Senate twice amended this language to require either notice, an order, or a warning before allowing assessment of cumulative daily penalties. See Sen. Jour. 301, 312 (Mar. 30, 1989 Vt. Bien. Sess.). The Legislature, however,

ultimately accepted the House version, which deleted the requirement that additional penalties may apply only after receipt of a notice, order, or warning. See House Jour. 787 (May 2, 1989 Vt. Bien. Sess.); Sen. Jour. 643 (May 2, 1989 Vt. Bien. Sess.); 1989, No. 98, § 1 (codified as amended at 10 V.S.A. § 8010(c)). This Court will reject construction of an ambiguous statute where amendments to the same effect were expressly rejected by the Legislature. See *In re Lunde*, 166 Vt. 167, 170, 688 A.2d 1312, 1314 (1997).

¶ 17. Third, the construction Deso seeks would conflict with UELEA's statute of limitations provision, 10 V.S.A. § 8015. Section 8015(2) requires actions brought under the Act to commence within six years from the date a continuing violation ceases. It would be nonsensical to simultaneously require notice, i.e., filing an administrative order, prior to establishing a continuing violation and at the same time set the statute of limitations for taking action, i.e., filing administrative orders, at six years after a continuing violation ceases. See *State v. Lussier*, 171 Vt. 19, 36, 757 A.2d 1017, 1028-29 (2000) (citing *Craw v. District Court*, 150 Vt. 114, 119, 549 A.2d 1065, 1069 (1988), for proposition that we reject statutory construction that leads to absurd results).

¶ 18. Finally, we note that UELEA is a remedial statute and, as such, it must be construed liberally "so as to furnish all the remedy and accomplish all the purposes intended." *State v. Custom Pools*, 150 Vt. 533, 536, 556 A.2d 72, 74 (1988). The purpose of UELEA is, inter alia, to enhance the protection of the environment and human health, prevent unfair economic advantage obtained by persons who operate in violation of environmental laws, foster greater compliance with environmental laws, and deter repeated violations. 10 V.S.A. § 8001. Deso's construction would require that the maximum penalty for any violation — no matter how hazardous to the environment or

human health, or how long it existed, or the extent of profit realized through the misconduct — never exceed $25,000, unless that violator continues the misconduct after issuance of an administrative order. Such a result would create an artificially low ceiling on penalties and defeat the purpose of the Act by limiting its deterrent effect. This is particularly relevant where, as here, the violation ceased because Deso sold the facility while the violation was ongoing, and not because he stopped his eighteen months of misconduct.

¶ 19. Thus, we hold that continuing violations under 10 V.S.A. § 8010(c) may include any violation that persists longer than one day, regardless of whether the violation is currently ongoing or has ceased. We disagree with Deso's contention that this means that the Secretary may issue a $100,000 fine any time a violation lasts longer than ten days. Deso fails to understand that 10 V.S.A. § 8010(c) sets only the maximum penalty. To fix the actual penalty amount the Secretary must apply the criteria set forth in § 8010(b).

### III.

¶ 20. Finally, Deso asserts that in calculating the costs he avoided through noncompliance the environmental court erred by including $5,000 to dig up and replace the underground piping for the Stage II vapor recovery system. Deso contends that because no evidence was given at trial proving that the underground pipes had failed before Deso sold the station, it was clear error for the court to conclude that he would have had to replace the pipes had he timely installed a Stage II vapor recovery system. We disagree.

¶ 21. We will affirm the trial court's findings of fact unless, "viewing the evidence in the light most favorable to the prevailing party and excluding the effect of modifying evidence, a finding is clearly erroneous." *Houle v. Quenneville*, 173 Vt.

80, 93, 787 A.2d 1258, 1267 (2001) (internal quotations and citations omitted). "A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding." *Mullin v. Phelps*, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994) (internal quotations and citations omitted).

¶ 22. At trial, Douglas Cone, the manager of the firm that originally installed the underground pipes in 1994, testified that the pipes would most likely have malfunctioned because of a design error, defective installation, or lifting due to frost heaves. The uncontested evidence at trial showed that Deso installed only minimal frost proofing above the pipes, that he never caused the pipes to be tested, and that the new owner had the pipes tested and discovered the failure within months of purchase. If the pipes were designed or installed incorrectly, then Deso is clearly liable. If the pipes failed due to frost damage, the evidence shows that Deso controlled the property for at least five winters, whereas the new owner discovered the problem prior to his first winter. Based on these facts, there was sufficient credible evidence for the trial court to conclude that the pipes either never worked, or failed while Deso owned the property.

¶ 23. Additionally, we find Deso's attempt to claim credit for work left incomplete and unmaintained since 1994 wholly unpersuasive in light of the regulatory requirements he ignored. See Air Pollution Control Regulations, Stage II Vapor Recovery Controls at Gasoline Dispensing Facilities, 7 Code of Vt. Rules § 5-253.7(e)(1)(i), at 12 031 001 — 36.4. (requiring initial testing of underground piping to verify proper installation and functioning); *id.* § 5-253.7(d)(3) (requiring a gas station owner to inspect and maintain all components of a Stage II vapor recovery system in good working order); *id.* § 5-253.7(d)(5), (6), at 12 031 001 —

36.3 (requiring immediate replacement of any defective components).

¶ 24. The environmental court's determination of the maximum statutory penalty and Deso's economic benefit for avoided costs are affirmed. The court's determination that Deso's economic benefit also included all profits earned from gasoline sales in violation of Air Pollution Control Regulation § 5-253.7 is reversed, and the cause is remanded.

*The penalty calculation of the economic benefit Deso gained by avoiding costs is affirmed. The penalty calculation of the economic benefit Deso gained by transferring gasoline in violation of the Air Pollution Control Regulation § 5-253.7 is reversed, and the matter is remanded for further proceedings consistent with this opinion.*

Note: Justice Dooley sat at oral argument but did not participate in this decision.