STATE OF VERMONT
ENVIRONMENTAL COURT

Secretary, Vermont Agency of Natural Resources,  }
    Plaintiff,  }
      }
    v.  }    Docket No. 41-2-02 Vtec
      }    (Stage II Vapor Recovery)
Mountain Valley Marketing, Inc.,  }
    Respondent.  }

Secretary, Vermont Agency of Natural Resources,  }
    Plaintiff,  }
      }
    v.  }    Docket No. 278-12-02 Vtec
      }    (Stage II Vapor Recovery)
Premium Petroleum, Inc.,  }
    Respondent.  }

Secretary, Vermont Agency of Natural Resources,  }
    Plaintiff,  }
      }
    v.  }    Docket No. 176-8-02 Vtec
      }    (Stage I and II Vapor Recovery)
Premium Petroleum, Inc., Odessa Corp.,  }
 Timberlake Associates, and Wesco, Inc.,  }
    Respondents.  }

Secretary, Vermont Agency of Natural Resources,  }
    Plaintiff,  }
      }
    v.  }    Docket No. 175-8-02 Vtec
      }    (Hazardous Waste
Premium Petroleum, Inc., Odessa Corp.,  }    Management Regulations)
 Timberlake Associates, and Wesco, Inc.,  }
    Respondents.  }

## Decision and Order on Pending Motions

In all of the above-captioned cases, the Secretary of the Vermont Agency of Natural

Resources ("ANR" or "the Agency") issued administrative orders pursuant to 10 V.S.A. §8008 against the respective respondents, all of whom timely requested a hearing in Environmental Court. In all of the above-captioned cases, Respondents (which are all related corporations or entities) are represented by Jon Anderson, Esq. and William E. Simendinger, Esq.; and the Agency of Natural Resources is represented by Mark J. Di Stefano, Esq. and Laura Q. Pelosi, Esq.

Docket No. 41-2-02 Vtec involves an administrative order issued on January 24, 2002, regarding Respondent Mountain Valley Marketing, Inc., alleging violations of the Air Pollution Control Regulations regarding Stage II Vapor Recovery six-and-a-half months in duration at its Waitsfield gasoline station, and imposing a monetary penalty of $27,500. Docket No. 278-12-02 Vtec involves an administrative order issued on November 26, 2002, regarding Respondent Premium Petroleum, Inc., alleging violations of the Air Pollution Control Regulations regarding Stage II Vapor Recovery eighteen months in duration at its Colchester gasoline station, and imposing a monetary penalty of $63,500. Docket No. 176-8-02 Vtec involves an administrative order issued on July 31, 2002, regarding Respondents Premium Petroleum, Inc., Odessa Corp., Timberlake Associates, and Wesco, Inc., alleging violations of the Air Pollution Control Regulations regarding Stage II Vapor Recovery at three different gasoline stations (and regarding Stage I Vapor Recovery at one of those stations), and imposing a monetary penalty of $6,500. Docket No. 175-8-02 Vtec involves an administrative order issued on July 31, 2002, regarding Respondents Premium Petroleum, Inc., Odessa Corp., Timberlake Associates, and Wesco, Inc., alleging 25 violations of 13 sections of the Hazardous Waste Management Regulations regarding exempt and small-quantity generators of hazardous waste, at nine different gasoline stations, and imposing a monetary penalty of $59,900. The total amount of monetary penalties imposed in the administrative enforcement orders that are the subject of the above-captioned cases is $157,400, involving approximately 33 alleged violations at

2

fourteen different gasoline stations, if each alleged violation at each different station is considered a separate alleged violation. The parties dispute the appropriate type, amount and source of discovery, both in connection with Respondents' preparation of a selective enforcement argument, and in connection with the Agency's discovery of Respondents' financial information.

In its decisions involving discovery issues among the same parties in superior and district courts, Wesco, Inc. v. Sorrell, 2004 VT 102, and State of Vermont v. Wesco Inc. and Odessa Corp., 2006 VT 93, the Supreme Court has emphasized that the trial courts have inherent power to control discovery in litigation pending before them, and that discovery rulings may be revisited and altered by the trial court as the litigation unfolds. In the present case, Respondents continue to seek discovery of information from the Enforcement Division of the Agency, in aid of their argument that they have been unconstitutionally singled out for enforcement by the Agency's issuance of the above-captioned administrative enforcement orders.

As explained in our October 12, 2004, August 11, 2003, and July 7, 2003 orders, to succeed in an argument of selective enforcement, particularly in a civil case, Respondents must satisfy both prongs of the two-part test described in In re Appeal of Letourneau, 168 Vt. 539, 549 (1998, as corrected 1999). The first prong is that "the person, compared with others similarly situated, was selectively treated;" the second is that the "selective treatment was based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Respondents initially sought extensive discovery regarding both prongs of this test for selective enforcement. That is, on the one hand they sought to obtain information on the Agency's treatment of other regulated entities, and, on the other hand, they sought to

3

obtain information going to the motivation of the Agency and its personnel in the particular instances of the issuance of the four administrative enforcement orders that are the subject of the above-captioned cases.

This Court issued orders regulating discovery in stages, to allow necessary discovery while minimizing its imposition on the work of the Agency and its enforcement division. This Court ruled that Respondents are entitled to discovery on the first prong of the selective enforcement test, allowing discovery of only a subset of "materials generated in connection with orders, assurances of discontinuance, or court proceedings under 10 V.S.A. Chapter 201 as of or after November 2, 1990:" those falling within the classification of public records and available under Vermont's Access to Public Records law absent the pendency of this litigation. This Court reasoned that, under 4 V.S.A. § 1004(a), the requested information relating to the first prong was "necessary to a full and fair determination of these proceedings" in connection with Respondents' effort to defend against the administrative order proceedings by asserting a selective enforcement defense.

It is important to understand that this Court entirely postponed ruling on any disclosure of information going to the second prong of the selective enforcement test, that is, relating to the motivation of the Agency and its personnel, until and unless Respondents would have made out a prima facie case to the Court on the first prong. To do that, Respondents would have to show there were other entities that both were similarly situated and were treated differently. In the present phase of discovery, the Court allowed Respondents access only to enough information[1] for them to determine if they could make

_____

[1] The Court provided for most of that discovery to come from documents in the Court's own files (whether at the Court's offices or at the Public Records repository). The Court ruled that Respondents could obtain the docket sheets and look through the files, and could determine whether they involve 'similarly situated' entities by whatever test of similarity Respondents wished to employ. The Court noted in its October 2004 decision that it had made no ruling on what categories of similarity are appropriate, and that Respondents had suggested none other than 'similarly situated gas station operators.' All

4

out such a prima facie case to the Court.   Moreover, this Court required Respondents to extract all the useful information from the Court's files before the Court would consider conducting any in camera review to rule on any specific requests for Agency file material.

In its October 2004 decision, this Court noted that:

> [t]here must be a finite number of gasoline stations in Vermont, some subset of which is neither owned nor operated by Respondents.  Once that subset is identified, the determination of whether they are similarly situated and how enforcement matters regarding them have been handled by the Agency will be a much narrower task than it may be at present.

The October 2004 decision clearly stated that after Respondents would have examined all the information relating to the first prong, if they were to decide to proceed with more discovery on selective enforcement rather than simply proceeding in this Court with the administrative order cases,[2] they would then have to make the threshold showing that others were 'similarly situated' yet treated differently, before they would be allowed even to request further discovery on the second prong, related to the motivation of the Agency's personnel.

Respondents obtained the discovery allowed by this Court's previous orders.  The present motion to compel renews their motion to compel further discovery on both prongs

_____

that the Court ordered the Agency itself to produce was a list of final administrative orders for which no Environmental Court hearing had been requested, as those would not be found in the Court's files.  The Court did not order production of any settlement discussions or privileged investigative material.

   [2]  In the October 2004 order, we reminded the parties that the issue of whether there was a violation and, if so, what is an appropriate penalty, is de novo before the Court, and that the Court would have authority to impose a different penalty amount from the amount imposed by the Agency in its initial administrative orders or from the amount now sought by the Agency in these court proceedings.  We noted that, if Respondents wish to present evidence that the amount sought is inappropriately high, they would be able to present that argument in the context of the 10 V.S.A. §8010(b) factors that must be considered de novo by the Court in these court proceedings.

5

of the selective enforcement claim, arguing that they have satisfied the required threshold of showing that they have met the first prong: that others were similarly situated yet treated differently.

Respondents argue that they have made out a prima facie case on the first prong of their showing of selective enforcement. They note that, statistically, the monetary penalties imposed by the Agency in the four administrative orders at issue in the present cases exceed 60% of the average monetary penalties "collected" annually by the Agency from penalties imposed in administrative orders and in assurances of discontinuance (settlement orders) plus moneys expended under settlement agreements towards supplemental environmental projects. Respondents also argue that the monetary penalties imposed by the Agency in these four administrative enforcement orders are considerably higher than the monetary penalties imposed in other administrative enforcement cases as resolved by settlement or otherwise in Environmental Court, even in other cases in which they argue the environmental consequences of the violations were greater.

Under the Uniform Administrative Procedure Act, 10 V.S.A. Chapter 201, the Agency has authority unilaterally to issue an administrative order alleging that a respondent has violated an environmental statute or regulation. The order may include a compliance order component, requiring that the respondent take some action or refrain from taking some action, similar to injunctive relief in Court. This component of administrative orders is not at issue in the present cases.

An administrative order may also include the payment of a money penalty. 10 V.S.A. §8008(c)(3). If a respondent receives and accepts an administrative order, that final administrative order does not come to the attention of the Court and does not receive a docket number.[3]

_____

[3] Hence the directive that the Agency provide Respondents with a list of administrative orders for which no request for hearing was made. There is no indication

6

A respondent who receives and wishes to challenge any element of an order may file a notice of request for hearing, which effectively removes the matter to the jurisdiction of the Environmental Court. 10 V.S.A. §8012. As the determination of the penalty is <u>de novo</u> with the Court (see footnote 2 above), the penalty actually imposed by the Court if the matter goes to trial may be greater than or less than that imposed in the original administrative order. In addition, similarly to any civil court matter, the administrative enforcement dispute may be settled by the parties by their agreement to the issuance of a consent order.

The Uniform Environmental Enforcement Act also provides a formal mechanism for the settlement of environmental enforcement disputes "as an alternative to administrative or judicial proceedings." 10 V.S.A. §8007. That is, in lieu of issuance of an administrative order under 10 V.S.A. Chapter 201, or in settlement of an administrative order proceeding in Environmental Court, or even in lieu of initiating civil or criminal enforcement proceedings under other statutes, under this section the Agency may accept from a respondent a so-called "assurance of discontinuance" of the violation, commonly referred to as an AOD. As well as including compliance schedules and the payment of monetary penalties, unlike an administrative order an AOD may also include "contribution toward other projects related to the violation, which the respondent and the secretary . . . agree will enhance the natural resources of the area affected by the violation, or their use and enjoyment." §8007(b)(2). These projects are referred to as "supplemental environmental projects" or SEPs. Whether an AOD is filed initially with the Court as a settlement, or is filed in settlement of a dispute that originated with an administrative order, under §8007(c) it is thereafter signed by the court and becomes a judicial order. It

that Respondents included any of these final administrative orders either in their statistical analysis or in their discussion of purportedly similarly-situated cases.

is the equivalent of a consent order or a settlement order in that it represents the agreement of the parties, presumably following some amount of negotiation and compromise by both parties.

Respondents cite ten Stage I and II vapor recovery assurances of discontinuance[4] as similar cases. They do not analyze the litigated vapor recovery case of Agency of Natural Resources v. Deso,[5] Docket No. 204-9-00 Vtec. Vapor recovery programs regulate the recapture of vapors that otherwise would be emitted into the air during the filling of bulk gasoline storage tanks at gasoline stations (Stage I), or the filling of vehicle gasoline tanks at gasoline stations (Stage II); all of these examples involve gasoline stations. Respondents have not presented any information regarding the throughput of these other gasoline stations, or the dates on which they became subject to the vapor recovery regulations, or any other measure of comparability that would help the Court to determine whether they are "similarly situated" to Respondents' gasoline stations.

However, and much more importantly, none of these cases began with an initial administrative enforcement order issued by the Agency. All ten of these cases instead arrived at the Court as assurances of discontinuance (AODs), filed with the Court as

---

[4] In order of their date of filing with the Court, the ten vapor recovery cases cited by Respondents are: Secretary v. Bourne, Docket No. 103-6-98 Vtec; Secretary v. Stewart's Marketing Corp.; Docket No. 120-7-98 Vtec; Secretary v. Midway Oil Corp., Docket No. 130-7-98 Vtec; Secretary v. Irving Oil Corp., Docket No. 29-3-99 Vtec; Secretary v. Salamin Handy Family Trust, Docket No. 60-3-00 Vtec; Secretary v. Champlain Oil Co., Docket No. 95-5-00 Vtec; Secretary v. Impey, Docket No. 226-10-02 Vtec; Secretary v. RLD Enterprises, Inc., Docket No. 248-11-02 Vtec; Secretary v. Slimain Handy's Convenience Stores, Inc., Docket No. 286-12-02 Vtec; and Secretary v. McShinsky, Inc., Docket No. 190-10-03 Vtec.

[5] This case involved a Stage II vapor recovery administrative enforcement order at a single gasoline station. The Secretary had imposed a monetary penalty of $44,000 in the administrative order, the Court had imposed the maximum penalty of $100,000, and the Vermont Supreme Court had reversed. Agency of Natural Resources v. Deso, 2003 VT 36, 175 Vt. 513 (2003). After remand, the parties settled for a monetary penalty of $50,000 and a supplemental environmental project of an additional $10,000.

8

previously-negotiated settlements. As discussed above, cases that arrive at the Court as AODs have already been negotiated between the parties, and by their very nature are not comparable with cases that at least begin as administrative orders, as there is no way to tell what monetary penalty would have been imposed in an administrative order, even if it was later settled in connection with a court proceeding. Negotiated settlements, whether of administrative monetary penalties or civil damages, are normally lower than the amounts sought in the initial administrative order or complaint, reflecting what each party relinquishes in uncertainty and costs of litigation in return for a definite result. See, e.g., Secretary, Agency of Natural Resources v. McGivern, Docket No. 3-1-06 Vtec (initial administrative order imposed monetary penalty of $5,250; settlement order (AOD) imposed $500). A court cannot determine from the terms of a settlement document what would have been sought in an initial administrative order or complaint, or to what extent problems of proof or costs of litigation may have caused a plaintiff to be willing to discount the amount initially sought, or what risks or costs of litigation may have caused a defendant or respondent to be willing to sign on to the particular settlement terms.

Respondents contrast the four above-captioned administrative enforcement orders with seventeen open burning assurances of discontinuance,[6] in which they argue the

---

[6] In order of their date of filing with the Court, the seventeen open burning cases cited by Respondents are Secretary v. Mills, Docket No. 20-2-98 Vtec; Secretary v. Fanelli Corp. d/b/a Santa's Land, Docket No. 127-7-99 Vtec; Secretary v. Buckman, Docket No. 6-1-00 Vtec; Secretary v. O'Keefe, Docket No. 61-3-00 Vtec; Secretary v. Town of Williston Fire Dept., Docket No. 75-4-00 Vtec; Secretary v. Brisson, Docket No. 87-4-00 Vtec; Secretary v. Agency of Transportation, Docket No. 255-11-00 Vtec; Secretary v. Moscow Mills, Inc., Docket No. 8-1-02 Vtec; Secretary v. Martin, Docket No. 115-5-02 Vtec; Secretary v. Morse, Docket No. 136-6-02 Vtec; Secretary v. G.W. Tatro Construction, Inc., Docket No. 144-6-02 Vtec; Secretary v. Town of Stratton, Docket No. 147-7-02 Vtec; Secretary v. Rogers, Docket No. 222-10-02 Vtec; Secretary v. Emch, Docket No. 42-3-03 Vtec; Secretary v. Messier, Docket No. 52-3-04 Vtec; Secretary v. Cicia, Docket No. 88-6-04 Vtec; and Secretary v. D.T. Supply, Docket No. 127-7-04 Vtec.

Agency imposed lower monetary penalties than it is seeking here. All but one of these cases, Secretary v. O'Keefe, Docket No. 61-3-00 Vtec,[7] were initially filed with the Court as settlements (AODs), but even if the monetary penalties in these open burning cases had been imposed by the Agency in initial administrative enforcement orders, the respondents in these open burning cases have not been shown to be in any way similarly situated to Respondents, as the asserted violations do not involve gasoline stations, do not involve the air pollution vapor recovery regulations, and do not involve the hazardous waste regulations. Even if the asserted violations had been similar, Respondents have not shown that the individual or governmental or corporate respondents who settled these open burning violations were in any way similar to Respondents' business, or that the numbers or types or durations of violations were in any way similar.

The remaining sixteen cases cited for comparison by Respondents consist of three air pollution assurances of discontinuance[8] not involving Stage I or II vapor recovery or gasoline stations and thirteen assurances of discontinuance involving violations of the hazardous waste regulations.[9]

---

[7] The initial administrative enforcement order in this case imposed a monetary penalty of $7,000, which was reduced to a $400 monetary penalty in the settlement AOD.

[8] In order of their date of filing with the Court, the three other air pollution cases cited by Respondents are: Secretary v. Springfield Electroplating, Inc., Docket No. 210-11-98 Vtec; Secretary v. MacIntyre Fuels, Inc., Docket No. 5-1-00 Vtec; and Secretary v. Vermont Precision Tools, Inc., Docket No. 2-1-03 Vtec.

[9] In order of their date of filing with the Court, the thirteen other hazardous waste cases cited by Respondents are: Secretary v. Stewart's Marketing Corp., Docket No. 153-8-98 Vtec; Secretary v. Vermont Precision Tools, Inc., Docket No. 160-9-98 Vtec; Secretary v. Mad River Canoe, Inc., Docket No. 26-2-99 Vtec; Secretary v. The Offset House, Docket No. 79-5-99 Vtec; Secretary v. Corse, Docket No. 132-7-99 Vtec; Secretary v. Carris Reels, Inc., Docket No. 164-9-99 Vtec; Secretary v. Harbour Industries, Inc., Docket No. 92-6-01 Vtec; Secretary v. Sandri, Docket No. 202-12-01 Vtec; Secretary v. The Offset House, Inc., Docket No. 170-8-02 Vtec; Secretary v. Great Brook Furniture, Ltd., Docket No. 12-1-03 Vtec;

Because the three air pollution assurances of discontinuance were filed with the Court initially as settlements, they suffer from the same problems determining comparability as discussed regarding the other purportedly-comparable categories. Moreover, the three air pollution assurances of discontinuance involve companies operating stationary source air pollution sources, subject to a different regulatory program than gasoline stations subject to the Stage I and Stage II vapor recovery regulations.

Of the hazardous waste assurances of discontinuance, all but two were filed with the Court initially as settlements; these also suffer from the same problems determining comparability as discussed regarding the other purportedly-comparable categories. One case, Secretary v. Corse, Docket No. 132-7-99 Vtec, was initially filed as an emergency order under 10 V.S.A. §8009, requiring emergency remedial action but not addressing a penalty.

We examine more carefully the only case cited by Respondents that did initially come to the Court as an administrative enforcement order, Secretary v. Sandri, Inc., Docket No. 202-12-01 Vtec, also as it involved an arguably similarly-situated Respondent, even though it was subsequently resolved through a negotiated assurance of discontinuance. As originally issued, the administrative enforcement order in Sandri involved 34 violations of 15 different sections of the Hazardous Waste Management or Underground Storage Tank Regulations at eight different gasoline stations. Contrary to Respondents' argument, the amount initially imposed by the Agency in its administrative enforcement order in Sandri was $65,000. The fact that in the Sandri settlement order (assurance of discontinuance) the violations were reduced to 33 violations at seven stations, and that the monetary penalty was reduced in the settlement to a total of $32,500 (an outright penalty

Secretary v. Vermont Tubbs, Docket No. 16-1-03 Vtec; Secretary v. Agway Energy Products, LLC, Docket No. 212-12-03 Vtec; Secretary v. Janos Technology, Inc., Docket No. 142-8-04 Vtec; and Secretary v. Hazelett Strip-Casting Corp., Docket No. 147-8-04 Vtec.

of $16,250 in addition to a supplemental environmental project contribution of an additional $16,250) does not show that, in the initial administrative enforcement order, Respondents were similarly situated but treated differently.

Rather, the monetary penalty in <u>Sandri</u> is roughly comparable to the $59,900 imposed in the initial administrative order in Respondents' comparable case (Docket No. 175-8-02 Vtec) for Respondents' alleged violations of the Hazardous Waste Management Regulations at nine different gasoline stations. These penalties may be analyzed as averaging $8,125 per gasoline station in the <u>Sandri</u> case as compared with $6,656 per gasoline station in Respondents' case; or as averaging $1,912 per violation in the <u>Sandri</u> case as compared with $2,396 per violation in Respondents' case; or as ranging between $1,912 and $13,384 per station in the <u>Sandri</u> case as compared with between $2,396 and $14,376 per station in Respondents' case, depending on the number of alleged violations per station. Each comparison shows that Respondents' hazardous waste case and the <u>Sandri</u> case falls within a reasonably similar range of values. Even if the violations in <u>Sandri</u> were more serious or deserved a higher penalty than the penalty for the hazardous waste violations in the present case, Respondents and the respondents in <u>Sandri</u> appear to have received reasonably similar treatment to the extent they are similarly situated.

The principle of equal protection does not require the Agency to choose between issuing enforcement orders against all possible violators strictly equally, or foregoing enforcement against any. <u>LeClair v. Saunders</u>, 627 F.2d 606, 608 (2d Cir. 1980). Rather, equal protection simply requires the Agency to refrain from treating similarly-situated violators differently based on an improper motive. We do not reach the question of discovery as to motive, as Respondents have not made out a <u>prima facie</u> case of disparate treatment by comparison with the <u>Sandri</u> case.

Finally, the fact that the total amount of monetary penalties imposed in the four administrative orders in the present cases amounts to approximately 60% of the penalties

in fact collected[10] by the Agency in an average year, including in all the Agency's settled cases, does not show that Respondents have been differentially treated. Even if only compared to similarly situated respondents, that is, to respondents with multiple gasoline station locations with alleged violations of the vapor recovery and/or hazardous waste regulations, monetary penalty amounts initially imposed in administrative enforcement orders cannot be compared to amounts imposed in consent orders or assurances of discontinuance, and certainly cannot be compared with amounts allowed by assurances of discontinuance to be expended on supplemental environmental projects rather than being deposited as monetary penalties in the state treasury.

Accordingly, Respondents have failed to show that there were other entities that were similarly situated yet were treated differently with regard to the imposition of penalties in any initial administrative enforcement orders. Respondents have therefore failed to make out a prima facie case for the first prong of their selective enforcement argument. Accordingly, their motion to compel further discovery with regard to selective enforcement is hereby DENIED.

_____

[10] Apparently using the Agency's annual reports to the legislature under 10 V.S.A. §8017, Respondents averaged the total monetary amounts "collected" (rather than those imposed in administrative enforcement orders) for the years 1996 through 2004, including "collected" penalties imposed in settlements (assurances of discontinuance or AODs) and "verified" moneys allowed by those settlements to be expended on supplemental environmental projects (SEPs), as well as a category entitled "collected penalties." It is unclear whether this latter category includes any penalties imposed by court orders after litigation, or any penalties imposed in final administrative orders that did not become court cases, or any civil or criminal penalties resulting from litigation outside the scope of 10 V.S.A. Chapter 201. Respondents calculated an average annual penalty amount of $262,665. Neither party provided the Court with statistics on the amounts imposed in initial administrative orders during any particular time period.

An in-person conference and motion hearing is hereby scheduled to be held at the Costello Courthouse on Cherry Street in Burlington at 3:30 p.m. on Thursday, September 28, 2006, to undertake any necessary in-camera review of the economic information sought in discovery by the Agency and thereafter to rule on the Agency's Motion to Compel, as well as to discuss the appropriate next steps to be scheduled in these matters. The parties should be prepared to discuss what limitations on the proprietary nature of that information should be considered by the Court in connection with the Agency's Motion to Compel, and should be prepared with the unavailable dates for themselves and their witnesses for any necessary hearings on the merits of these cases in December of 2006, the first half of January of 2007, and the first half of April of 2007.

Done at Berlin, Vermont, this 13th day of September, 2006.

_____
Merideth Wright
Environmental Judge