DOOLEY, J., dissenting.
¶ 45. As strongly as I agree with the result in this case, I disagree that the method of reaching it is either appropriate or available. In saying this, I understand that the facts alleged by plaintiff present the strongest case for court intervention and relief and the compelling nature of claims like plaintiff's has caused many courts around the country to respond. Under the unique circumstances in Vermont, I believe we should resist the path the majority has chosen. I have two main reasons for this view: (1) in this area of the law controlled by legislation, where our role is interstitial, there is not enough room for us to act as the majority has; and (2) at this time, when the Legislature is poised to act in a comprehensive manner, this decision is likely to cause more harm than good. I start with the second reason because for me it is the far more important one.
*575 ¶ 46. The strength of development of the law through judicial decision, the essence of the common law, is the consideration over time of the application of policy judgments to the myriad of factual circumstances that arise and the need to adapt those policy judgments to changing circumstances. Indeed, the majority commits to case-by-case development of what it believes is the proper resolution of the cases that will come from modern family relationships unless the Legislature otherwise acts. See ante, ¶44. But the greatest weakness of development by judicial decision occurs where certainty and predictability is most needed, where judicial decision can control only a small part of the implementation of policy or where the adversary system-the backbone of the judicial process-is dysfunctional. All three of these circumstances are present here and lead me to a conclusion different from the majority.
¶ 47. In a traditional case to determine parental rights and responsibilities with respect to children, the litigants have a clearly recognized right to some form of continuing relationship with the child or children involved, and the issue before the court is what form and manner of parental rights and responsibilities each party should have. In deciding this question, the court implements a fundamental policy of protecting the best interests of the child involved, with the understanding that maintaining some form of parent-child contact with each parent is almost always in the best interests of the child.
¶ 48. We know from long experience that determining parental rights and responsibilities within an adversary litigation system can be a painful and emotional process that is, itself, rarely in the best interests of the child and can inflict serious emotional and developmental damage to the child whose best interest we must protect. It can also go on a very long time as every interaction of parents becomes the subject of a new motion to change or enforce the distribution of rights and responsibilities. We also know that litigation over parental rights and responsibilities is expensive, particularly for each party to employ effective legal counsel-an important tool in the adversary system-such that most litigants cannot afford that cost, and proceed without counsel. Although we have strong civil legal assistance programs for those who cannot afford to pay a lawyer, contested custody litigation is an area where virtually no subsidized civil legal assistance is available. The Vermont Judiciary and the Vermont Bar Association have made important progress to enable self-represented litigants to become more effective in participating in court proceedings, but it is unlikely that self-representation will be adequate to fully present a contested custody case. In many cases-this one is an example-the fairness of the system is distorted by the fact that one side has counsel and the other side is self-represented, if represented at all.
¶ 49. The overall structure of the system-both the substantive law and the fundamental procedural law-is a product of, and is controlled by, legislation. In this state, that legislation has been the subject of constant legislative action to better define the rights of parents and the best way to enforce those rights, when the parents are or have been married to each other. This development has almost entirely occurred with respect to divorce actions between married parents.
¶ 50. At the same time as we have improved the law with respect to parental rights and responsibilities within traditional families formed by marriage, societal changes have eroded the function and frequency of marriage to the point where an increasing percentage of children are not *576 born of married parents and increasing percentages live in households where their primary caregivers are not married. Also at the same time, technology has changed methods of reproduction and promises to create even greater changes in the future. This has happened even as the opportunity for marriage has been extended to same gender couples by legislation in this state and by the U.S. Supreme Court decision in Obergefell v. Hodges, --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), for most of the rest of the country. The Legislature has not generally responded to the change in societal norms or to technology's role in reproduction with respect to caretaker rights and responsibilities to children of caregivers in roles traditionally assumed by parents or by persons who are part of the biological reproduction process. The need is urgent.
¶ 51. The need is not answered by an evolutionary process of judicial decisionmaking that starts with general factors and standards and, only by the application of those factors and standards to many factual situations in contested cases, produces bright lines and predictable rules. I can think of no area of the law that is in more urgent need of bright lines and predictable rules that ensure that prospective parents under a modern definition of the term understand clearly what must be done to protect parental rights and responsibilities at the time they are developing and do not leave the subject to reconstruction by litigation, exactly what the majority is doing here. The evolutionary process of judicial decisionmaking is part of the problem, not the solution. See R. O'Brien, Obergefell's Impact on Functional Families, 66 Cath. U. L. Rev. 363, 369 (2017) ("[M]any commentators bemoaned the nebulous grounds for these equitable remedies, as well as the costly and lengthy process their application required."). Only the Legislature can develop such a comprehensive system.
¶ 52. The deficiency in the judicial process is particularly apparent from two aspects of the majority's decision and the characteristics of this case. First, in essence the majority has ruled that all of the facts alleged in plaintiff's complaint are sufficient to reach a decision on whether plaintiff has standing. It is possible, and likely, that defendant will contest some or all of those factual allegations against no specification of which allegations are critical to a decision that standing is created, and which are not, and the weight to give to each of the relevant allegations. For example, the majority summarizes why plaintiff and defendant never sought a civil union or marriage and plaintiff never sought to adopt M.P., suggesting that these facts are relevant and the trial court will decide whether the reasons for inaction to formalize the relationships between plaintiff and defendant or plaintiff and M.P. are sufficient. In fact, I would predict the majority decision will create standing in plaintiff even if she chooses not to formalize any relationship with defendant or M.P. While this decision is in line with modern relationships, it leaves all the standing decisions to retrospective litigation, a situation that only legislation can fix as discussed below. See L. Harris, Obergefell's Ambiguous Impact on Legal Parentage, 92 Chi.-Kent L. Rev. 55, 84 (2017) ("This characteristic of these rules means that they cannot provide certainty about a child's legal parentage unless and until litigation occurs. Relationships remain vulnerable to disruption, and the expense and difficulty of litigation almost surely deters some functional parents from making claims that they could theoretically win."). It is common, even necessary, for appellate decisions to narrowly address the question before the Court, and avoid dicta that may *577 become unwise in the future, but that approach is not what is needed here.
¶ 53. The second aspect of this case that is concerning is the state of this litigation. This decision is issued ex parte with no participation of the defendant, a not uncommon situation in family litigation. Not only is plaintiff represented by a public-interest law firm with extensive experience, skill, and interest in the issue before us, but plaintiff's position is also supported by an amicus curiae brief from another advocacy organization with similar experience, skill, and interest. Briefs and argument were presented by only one side of this controversy. I don't believe I have ever seen another case as important as this one decided on such a one-sided presentation.[8]
¶ 54. The one-sided nature of the presentation is a historical fact for this Court, but portends what this case will look like in the future, whether presented to the trial court or again to this Court. We are entrusting a critical decision on the best interests of this child and a fundamental parental right to a process that is likely not to have a level playing field, a fundamental deficiency in family litigation.
¶ 55. Finally on this point, I recognize and agree that the primary reason to give rights to plaintiff is that continuing contact with M.P. is in M.P.'s best interests. But the method of achieving that result is critical to the achievement of it. Extensive litigation, particularly where it produces inconclusive and changing dispositions, is not in the best interests of M.P. and may produce actual harm. See Cloutier v. Blowers, 172 Vt. 450, 457-58, 783 A.2d 961, 967 (2001) (Dooley, J., dissenting) ("We know from numerous studies that custody litigation has a tremendous adverse impact on the children who are the subject of that litigation." (listing studies)). Bright lines and predictable results are important in achieving a decision where the process is consistent with the best interests of the child.
¶ 56. As discussed below in the context of the recent report to the Legislature, legislation is a much better answer to the need for comprehensive reform in this area. A good example is the recently enacted Maine Parentage Act, Me. Stat. tit. 19-a, §§ 1831-1939. This legislation provides for both presumed parentage and de facto parentage, as part of a comprehensive enactment that also covers assisted reproduction and the use and consequence of a gestational carrier. The tests of presumptive parent, ibr.US_Case_Law.Schema.Case_Body:v1">id. § 1881(3), and de facto parent, ibr.US_Case_Law.Schema.Case_Body:v1">id. § 1891, contain clarity that can come from legislation. For example, a presumed parent is defined as a person that "resided in the same household with the child and openly held out the child as that person's own from the time the child was born or adopted and for a period of at least 2 years thereafter and assumed personal, financial or custodial responsibilities for the child." Id. § 1881(3). Also important is that the legislation integrates the definition of a parent into the financial obligation to support the child, a subject not covered by the majority and presenting challenges under the current Vermont Parentage Act.
¶ 57. Another important model is the 2017 version of the Uniform Parentage Act, adopted by the Uniform Law Commission in July of this year. It is also comprehensive and contains sections on presumed parentage and de facto parentage.
*578 See Unif. Parentage Act §§ 608 - 609 (2017).
¶ 58. I have left the most important part of the dissent on this point for last. The majority introduces its decision with the statement that we are forced to act "[i]n the absence of guidance from the Legislature on this question," ante, ¶ 1, and concludes that there is an "urgent need for us to act." Ante, ¶ 40. If this were a year ago, I would agree no legislative action was in sight and it was fair to say no legislative guidance was available. But by Act No. 31 of the 2017 Session, the Legislature created a special committee to recommend comprehensive parentage legislation. The purpose of the Act is stated in the preamble:
Through this act, the General Assembly seeks to assemble attorneys and members with particular expertise in these matters, who can examine parentage laws in other jurisdictions and develop a proposal for the General Assembly to consider during the 2018 legislative session that integrates with our existing laws best practices for providing for the best interest of the child in various types of parentage proceedings.
2017, No. 31, § 1. The Committee is required to "study how Vermont's parentage laws should be updated to address various issues that have come before the courts in recent years and issues that have arisen and been addressed in other New England states on these matters, including assisted reproductive technology and de facto parentage." Id. § 2(c). It was required to produce a report "with its findings and recommendations for legislative action." Id. § 2(d).
¶ 59. The Committee has produced its report and recommended enactment of a statute based primarily on the Maine legislation described above with features from the Uniform Parentage Act. See Parentage Study Committee, Report and Recommendations for Modernizing Vermont's Parentage Law (2017), http://legislature.vermont.gov/assets/Legislative-Reports/Vermont-Parentage-Study-Committee-Report-and-Vermont-Parentage-Act.pdf [https://perma.cc/D8AS-HRLW]. Again, the recommended legislation is comprehensive and covers all aspects of modern parentage integrated with other laws-for example those on child support. The provisions on presumed parentage and de facto parentage are essentially those contained in the Maine legislation. See id. at 28 (suggesting language for 15 V.S.A. § 401(1)(D), granting presumption of parentage in Proposed Parentage Act when "individual resided in the same household with the child for the first two years of the life of the child, including periods of temporary absence, and openly held out the child as the individual's child"); id. at 30 (suggesting language for 15 V.S.A. § 501(3), explaining when court under Proposed Parentage Act shall find person a de facto parent). The conclusion of the report states: "The Committee's members collectively spent hundreds of hours researching and drafting the proposed Act.... [T]he committee members thank the Legislature for providing us with the opportunity to tackle this important and long-overdue issue." Id. at 11.
¶ 60. The standards and requirements in the proposed law are not entirely consistent with those in this decision. For example, the majority's decision places great emphasis on the fact that plaintiff and defendant adopted M.P. as a joint endeavor. This fact is not relevant to any of the requirements of de facto parentage under the Maine legislation, as embodied in the Parentage Study Committee's recommended legislation. Also of critical importance is that the Maine legislation requires that plaintiff prove a case by clear and convincing evidence. Again, the Parentage Study Committee adopts this recommendation.
*579 This subject is entirely absent from the majority decision. Rather than an urgent decision that foreshadows future ones to guide case-by-case decisions to address subsequent circumstances, see ante, ¶44, the likely result of this decision is confusion.
¶ 61. As I stated in my concurring opinion in Moreau v. Sylvester, 2014 VT 31, ¶ 39, 196 Vt. 183, 95 A.3d 416 (Dooley, J., concurring), I believe for multiple reasons that legislative action on the important issues raised in this case is the proper course of action and will accept the criticism that I am out of touch and heartless to the plaintiff in this case and others in pursuit of that goal. By Act 31, the Legislature has committed itself to address legislation in the 2018 session. This Court should stay its hand to give the Legislature the opportunity to act. See J. Parness, State Lawmaking on Federal Constitutional Childcare Parents: More Principled Allocations of Powersand More Rational Distinctions, 50 Creighton L. Rev. 479, 507 (2017) ("Current or recent significant legislative interest should cause courts to hesitate to act on their own. Such an interest may be found, for example, where a special advisory General Assembly committee is then contemplating, or recently contemplated, comprehensive legislation, or where comprehensive reforms, while not yet enacted, have recently been subject to significant General Assembly debate and public discourse that is likely to continue.").
¶ 62. I will only briefly address the first point addressed at the start of this decision. I continue to believe that the majority's view of Miller-Jenkins v. Miller-Jenkins, 2006 VT 78, 180 Vt. 441, 912 A.2d 951, is foreclosed by Moreau v. Sylvester, 2014 VT 31, ¶ 16, 196 Vt. 183, 95 A.3d 416.

I acknowledge that this situation was brought on by our own inaction, and in other circumstances we have sought out an adversary presentation by recruiting representation for the unrepresented party. We should have done so here.